GABRIEL W. COITE, TREASURER OF THE STATE OF CONNECTI-
CUT, *vs.* THE SOCIETY FOR SAVINGS.

The act of 1862 provides that every savings bank shall pay to the treasurer of the
state "a sum equal to three-fourths of one per cent. on the total amount of deposits
in such institution on the first day of July in each year." A savings bank had
invested a large amount of its deposits in securities of the United States, which
were exempt from state taxation. Held, that the tax was upon the corporation
as such, and not upon its property, and that therefore the bank was not entitled
to a deduction from the amount of the tax on account of the securities of the
United States so held. (One judge dissenting.)

AMICABLE submission to the superior court, upon an agreed
statement of facts.

The defendant is a savings bank, incorporated with the
usual powers and duties of savings banks, and located in the
city of Hartford. On the 1st day of July, 1863, it had in
deposit the sum of $4,758,273.37, of which the sum of
$500,161 was then invested in securities of the government of
the United States, which are declared by act of Congress to
be exempt from taxation.

An act passed by the legislature of this state in May, 1862,
provided as follows:—" The treasurers of the several savings
banks, societies for savings, and savings and building associa-
tions established in this state, shall, within the first ten days of
July in each year, make out under oath and deliver to the
Comptroller of Public Accounts, statements of the total
amounts of all deposits and stock in said institutions respect-
ively on the first day of the month in which such statements
are herein required to be made. And each of said savings
banks, societies for savings, and savings and building associa-
tions, shall pay to the treasurer of this state for the use of the
state a sum equal to one half of one per cent on the total
amount of deposits and stock in such institution on the first
day of July in each year, one half to be paid on or before the
20th day of July, and one half on or before the 20th day of
January annually ; said tax of one half of one per cent to be
in lieu of all other taxes upon said institutions and the

deposits therein. Provided however that this act shall not be so construed as to exempt from taxation any real estate held by any savings bank, society for savings, or savings and building association, over and above what may be required and used for the transaction of its appropriate business." By an act passed in May, 1863, the tax was made three-quarters of one per cent instead of one half of one per cent.

The question submitted to the court was, whether the defendants were liable to pay to the treasurer of the state three-quarters of one per cent on the whole amount of their deposits on the 1st day of July, 1863, viz: on $4,758,273.37, or only on the amount of their deposits at that time after deducting the amount ($500,161) invested in securities of the United States, that is, on $4,258,112.37.

The case was reserved by the superior court for the advice of this court.

*Hubbard*, for the plaintiff.

No right is claimed on behalf of the state to tax the securities of the federal government. Such a right probably does not exist under any circumstances—certainly not where, as in this case, such securities are by legislation of Congress declared to be exempt. Does the act in question attempt to tax such securities? If so the statute must, to that extent at least, be declared invalid. We are thus brought to a question of the meaning and construction of the act of 1862. And briefly premising that, except as prohibited by the constitution of the general government, the legislature of this state possesses the sovereign and absolute right of taxation, and that the remedy for unequal, unjust or oppressive taxation is wholly legislative, and not at all judicial, I respectfully submit, as the basis of my argument, the following proposition:—That the statute of 1862 does not impose a tax on the property as such of savings banks, but on the corporation as such, and that the specified per centage of the amount of their deposits is the mere standard of their taxable liability.

1. Where taxes are imposed on property, they are usually enforced by distress and warrant on the property. In addition

to this the tax is made by law a lien on the property. But here the law simply declares a personal liability, enforceable only by action at law in the same way as ordinary business liabilities are enforced.

2. The act of 1862 declares as follows: "said tax of one half of one per cent to be in lieu of all other taxes upon said institutions and the deposits therein," except real estate not held for the transaction of its appropriate business. It thus appears to be, not an ordinary property taxation, but another different and substituted mode of taxation.

3. If intended as a tax on property as such, it would be governed by some sort of valuation of that property. In all such cases the law provides for such a valuation, but here the law fixes the tax by a scale in a manner arbitrary, or, if this is not so, it assumes as matter of law that the amount of deposits will fairly represent the value of the property. In either case it becomes immaterial in what manner the funds of the bank are invested, or whether certain specific investments are subject to taxation or free from it.

4. The standard fixed by law is one which, in its very terms, ignores all reference to actual assets, modes of investment, accumulations, losses or profits. If the bank has earned a surplus, no matter how large, above the amount of its deposits, this surplus is not taxable. Suppose the bank had invested half a million in cotton instead of United States securities. That single investment would now be worth more than the entire aggregate of their present assets. Yet the taxes of the corporation would not be increased to the amount of a farthing. Suppose on the other hand that their investment in cotton should be destroyed by fire, or suppose in any other way the corporation should meet with losses, their taxes in such a case would not be diminished to the amount of a farthing. Thus it is seen that the law in question has no reference to the varying assets of the bank, and the varying value of those assets, but to the fixed arithmetical standard of " the total amount of all deposits." To suppose that the corporation is entitled to a reduction of taxes because some of their assets happen for the time being to be non-taxable, and are

not entitled to a reduction when a portion of these assets become worthless or non-existing, is preposterous.

5. This view of the case is strengthened by the fact that the same legislature which fixed the taxable liability of these institutions by reference to the amount of their deposits, also provided that for certain other purposes they should make a balance sheet and an exact return under oath of all their assets and liabilities, and of the exact kind, condition and value of all their assets. Is it not fairly deducible that if they had intended to levy the tax on property, or measure its amount by the value of that property, the legislature would have directed a similar return to be made to the comptroller and a payment to the treasurer on the amount thus returned?

6. Sundry cases, similar to the one at bar, have arisen in the state of New York, and have been decided in accordance with the claim now made. By the revised statutes of 1830 it was enacted that all moneyed corporations should " be liable to taxation on their capital," and " that the amount of capital stock paid in and secured to be paid in," (less certain specified deductions,) should be entered in the assessment roll. The tax was to be laid on the roll thus made out. Under this statute the courts held that the assessment was not on the property of the corporation, but upon the corporation itself, and that the amount of the assessment was to be governed by the amount of the capital stock alone, and not at all by the value of the property of the corporation. *People* v. *Commissioners of Taxes,* 23 N. York, 192 ; *People* v. *Supervisors of Niagara County,* 4 Hill, 20 ; *Bank of Utica* v. *City of Utica,* 4 Paige, 399 ; *Farmers' Loan & Trust Co.* v. *City of New York,* 7 Hill, 261; *Mutual Ins. Co.* v. *Supervisors of Erie County,* 4 Comst., 442 ; *Sun Mutual Ins. Co.* v. *City of New York,* 4 Seld., 241 ; *Bank of Commerce* v. *Commissioners of Taxes,* 25 How. Pr. R., 9. A case more directly in point than any of the above cited, recently arose between the banks of the city of New York and the commisioners of taxes and assessments of the city. On the 29th of April, 1863, the legislature of the state of New York passed an act in these words :—" All banks, banking associations and other moneyed corporations, shall be

liable to taxation on a valuation equal to the amount of their capital paid in, or secured to be paid in, and their surplus earnings (less ten per cent of surplus,) in the manner now by law provided, deducting the value of real estate held by any such corporation or association, and taxable as real estate." The Bank of the Commonwealth had a capital paid in and secured to be paid in of $750,000 ; invested in real estate $188,099.84 ; balance of capital $561,900.16. It had invested the entire balance of capital in United States securities. On this state of facts the commissioners of taxes inserted in the assessment roll of personal estate the entire balance of $561,900.16. The bank sued out a certiorari to the Supreme Court. That court affirmed the doings of the commissioners. Appeal was taken to the Court of Appeals. The latter court, in an opinion not yet published, has recently affirmed the judgment of the Supreme Court. In this case, Denio, Ch. J., giving the opinion of the court, says :—" It would seem plain enough that it is entirely immaterial what the assets of the bank then are. If the amount of the original nominal capital is alone to be taken into account, it would be officious and improper, or at least useless, for the assessors to make any examination or enquiry into the actual assets. The tax is not assessed upon the property or capital possessed at the time the annual enquiries are made by the proper officers, but upon the amount originally contributed to the corporate enterprise. This was fixed upon somewhat arbitrarily, it may be said, as representing with sufficient practical accuracy the sum upon which the public burdens ought to be assessed. We have seen that if the sum of this original contribution should be diminished to any extent by losses or depreciation of securities, no corresponding diminution was to be made in the assessed valuation. The reason for this was that the existing assets formed no part of the subject by which, according to the statute, that valuation was to be determined. Another criterion, namely the original capital, was to be taken as representing the taxable value. This reason equally excludes any enquiry into the existing assets, with a view to ascertain whether any part of them are in their own nature not subject to taxation.

If it could be shown that the discounted paper held by a bank for the currency notes in its drawer were forgeries, the assessors would not regard that circumstance, because the assets do not enter into the question and are no part of the data by which the taxable valuation is to be ascertained. And for the same reason, when it was shown on behalf of the bank that its securities were not in their nature taxable, the circumstance became utterly immaterial, since neither the character nor amount of such securities have any thing to do with the questions which the taxing officers were to determine."

7. The tax in question may be considered, and if necessary to sustain the statute should be considered, as an assessment on the franchise of the corporation. *Commonwealth* v. *People's Savings Bank*, 5 Allen, 428; *Bank of Commerce* v. *Commissioners of Taxes*, 25 How. Pr. R., 9. In the case last cited, the court, alluding to taxes imposed under the New York law before recited, say :—" According to that system it was immaterial as to the character or description of property what constituted the capital, as the tax was wholly irrespective of it. The tax was like one annexed to the franchise as a royalty for the grant."

*Chamberlin* and *Storrs*, for the defendants.

The defendants were incorporated in 1819. 2 Private Acts, 1049–57. Their charter authorizes the receiving of deposits, " loaning and improving the same to the best advantage," the division of the income among the depositors, and the withdrawal of the principal. And provisions are introduced tending to secure economy in the management of its affairs, and a division *of all the profits* among the depositors. " No president, vice president or trustee is to receive any compensation." Charter, sec. 7. Savings banks are authorized by general statute (Laws 1862, p. 11,) to invest in United States securities in larger proportionate amount than was here invested.

The disclaimer on behalf of the state of any right to tax the securities of the federal government renders it unnecessary to refer to the numerous decisions or acts of Congress on the sub-

ject. It may however be useful to notice that the statute of the United States, of February 25th, 1862, exempts these securities, whether " held by individuals, *corporations,* or associations."

The plaintiff claims that the statute of 1862 does not impose a tax on the property *as such* of savings banks, but on the corporations *as such,* and that the specified per-centage of the amount of their deposits is the *mere standard of their taxable liability.* That statute enacts that " the treasurers of the several savings banks, societies for savings, and savings and building associations, shall make annual return to the comptroller of the total amount of all deposits and stock in such institutions on the first of July in each year ; " and that each of said institutions shall " annually pay to the state treasurer a sum equal to one-half of one per cent *on the total amount of deposits and stock* in such institutions on such first day of July." The plaintiff has very properly, as we think, confined himself mainly to a discussion of the meaning and construction of this act. In endeavoring on our part to ascertain its true construction, we shall be aided by a reference to other provisions of the same statute, as well as by an examination of the general legislation of the state upon the subject of taxation, and especially upon the taxing of corporations.

1. And *first,* as to this particular statute :—It also enacts (sec. 3d,) that the secretaries or clerks of railroad and horse railroad companies, shall, in October of each year, make return to the comptroller of the number of shares in their respective companies, *the market value of the shares,* the length of their road, and of that portion (if any) without the state. And they are required to pay to the treasurer of the state a sum equal to three-fourths of one per cent of the value of the stock. Somewhat similar provisions are made (sec. 5th,) with regard to banks, insurance companies, telegraph companies, &c. &c. The act of 1863, increasing the rate of assessment, couples together savings banks, savings associations, railroads, insurance companies, &c.

2. Chapter 55th of the acts of 1862, which embraces this entire statute, is substantially a re-enactment of the act of

1859 upon the same subject, and the 3d section of the latter act speaks of a tax similar to the one in question as a tax " imposed *upon the stock*," &c. Chap. 67 of the acts of 1862 refers to ch. 55, as an act " imposing a tax *upon the total amount of deposits and stock*," &c. The second section of the same act has this clause ;—" Provided however, that any sum which may have heretofore been paid by said institutions, &c. *as taxes on the deposits and stock*." The taxes so referred to as " *taxes on the deposits and stock* " were paid under a statute *precisely similar* to the one we are called upon to construe.

3. In this state all taxes (unless it be a capitation tax) are upon *property* or *income*. The laws for the assessment of taxes call upon all persons " to make out lists of all their taxable *property;* " they speak of property " exempt from taxation;" of what shall be deemed " personal property ; ". then of the " real and personal *property* of corporations ; " and it is provided that the *property* of corporations shall be assessed and set in the lists in the " *same manner*" as if owned by an individual.

4. There can be no doubt that the taxes provided for in the same statute, in the same (or substantially the same) language, are imposed upon the *property* of railroad and insurance companies and of such savings associations or savings and building associations as have capital stock, as many of them have. In the absence of an explicit declaration of a different purpose, the court must presume that the intent of the legislature was the same with reference to all of the corporations named and coupled together, the enactments being " *in pari materia*."

5. In no case in which a tax is imposed *upon the property* of a railroad or other corporation, by the enactment that *a percentage* upon market value or otherwise shall *be paid to the treasurer*, &c., is there provision for enforcement by distress or warrant, nor is there a lien given.

6. The tax of three-fourths of one per cent upon *the market value* of stock of *railroads*, imposed by the acts of 1862 and 1863, is " *to take the place* of all other taxation," and *that* is clearly and confessedly a tax upon *the property* of the corpo-

ration.   The argument from both of these sources entirely fails to serve the plaintiff.

7. It is claimed that if this was intended as a tax on property *as such*, it would be governed by some sort of valuation of the property.   We answer that it is governed by quite as accurate a valuation as the other taxes referred to, and quite as accurate as the taxes sometimes imposed (as in New York) upon " capital *originally paid in*."   The *deposits* of a savings bank are entirely analogous to the *capital* of a railroad, bank, or insurance corporation.   They are its *capital*.   They are not *stock*, (*Savings Bank* v. *New London*, 20 Conn., 115,) but they are *capital*, and hold a relation *as capital* to the corporation and its depositors.   For the views of this court upon the question what is the *capital* of a corporation, and what does it embrace, and upon the general question of the intent of the legislature in enacting this statute, we refer to the reasoning of this court in *New Haven* v. *City Bank*, 31 Conn., 109, 115.   The deposits here, (as the capital in that case) *all* " belong to the depositors, being entrusted to the bank to be used and traded with for their exclusive benefit. Its transmutation into property of other kinds, while it alters the *form* of the investment, leaves its beneficial ownership unaffected, and every new acquisition of property is entirely for the depositors, in proportion to the original amount of their deposits."   The assumption as matter of law, that the amount of deposits will fairly represent the value of the companies' assets, is precisely like the assumption by the legislation of New York, that the amount originally paid in as capital fairly represents the present value of the assets of a bank. In that case, notwithstanding the opinion of a majority of the Court of Appeals in New York, (referred to by the plaintiff's counsel,) we can have little doubt that the dissenting opinion maintaining the doctrine for which we contend will be sustained by the Supreme Court of the United States, to which the case has been taken.   In answer to the claim of the plaintiff that the " *standard* " fixed ignores all reference to present values, " modes of investment, accumulations, losses or profits," we say that the adoption of the amount of deposits as a " standard

of taxable liability," is of itself conclusive that the tax, if not upon property *as such,* is *measured* by the *extent of the property,* the amount of the deposits being the *measure* of that extent. This is substantially admitted in the proposition which the plaintiff's counsel submits as the basis of his argument. This can not be done while a portion of the property, the amount of which is so adopted " as the standard of taxable liability," *is under the protecting power of a higher authority.* It is said to be " preposterous " to claim that we are entitled to a reduction because some of our assets are non-taxable, when we should not be so entitled if they were worthless or non-existing. But we say it is not only good law but good sense so to claim. The deposits are the standard *unless reduced by exemption;* lost or worthless assets can have no such effect. Exemption arises not simply from having parted with capital or deposits, but from having *transmuted a portion* of the amount into property *expressly exempt* from taxation and being the present owner of such exempt property. The immunity arises from having loaned a portion of the deposits to the general government and taken its certificates of debt in lieu thereof.

8. It needs no argument to show that a tax upon the defendant corporation *in respect to its property* and adopting the amount of such property as the basis or " *standard* " of taxation, is in effect precisely the same as a tax upon the property *as such. Indirectly* you thus tax *the government securities.* This can not be done. The intention of the law may be deduced from its *practical effect.*

9. The claim that this may be considered a tax on the *franchise* of the defendants is equally untenable. The tax is still *based* as to its amount upon the *property* or *deposits* (which, in the light of the reasoning of the court in the case referred to in 31 Conn., are the same thing) of the corporation. It would surely be " preposterous " to *presume* that the legislature intended to tax a franchise, non-remunerative and *burdensome* to the corporators, *without reference to property or business,* at a valuation of more than $4,000,000.

10. We say that the rule of constitutional immunity as

declared in the acts of Congress, and in the decisions of the Supreme Court of the United States, imparts to the power of the government to borrow money *complete immunity*, not only from *direct* interference by taxation upon property *as such*, but from *indirect* interference by the states in respect to the *lender*, "whether individual, corporation or association." The *modus* is immaterial. In whatever way taxation results or is effected upon the property, or upon the person or corporation *with reference to the property as a basis or "standard of liability*," it hinders and impedes the government in its power to borrow money, and is therefore unconstitutional and void.

It may be said that state corporations exist by the will of the state legislature, and that the state may therefore tax them as it pleases; but while they do exist, they, as well as individuals, are to be at liberty to loan money to the government and take the benefit of the exemption from taxation which such loans enjoy. Especially should that privilege be enjoyed where, as here, the law of the state expressly authorizes the corporation to loan its funds to the government. The case referred to in 5th of Allen's Reports, stands upon its own special facts and reasoning, and differs so materially from this case as not to be an authority.

McCURDY, J. This case is of more than ordinary importance, both from the amount of the interests at stake and the nature of the principles involved. Savings institutions have ever been favorites of the public and of legislative bodies. Immense sums are entrusted to their keeping. Great care should therefore be exercised to prevent injuring their undoubted rights. Very great care should also be observed, especially at the present time, not to lessen, however slightly, the ability of the nation to obtain by its credit the means to sustain its life.

On the other hand, no portion of the community should be released from its proper share of the public burdens, and the rightful authority of a state over the taxation of its own citizens should be rigidly upheld.

This right of a state to tax, is necessary to its very existence, and its power, except when restrained by some constitutional limitation, or by the fundamental principles of natural justice, (which control all legislation,) is supreme. Chief Justice Marshall, in the case of *Weston* v. *The City of Charleston*, (2 Peters, 449,) speaking of this authority, says, "it is a right which in its nature acknowledges no limits." In the use of this power the state may act judiciously or otherwise, but with the exercise of its discretion no court can interfere.

It was justly remarked by Judge Ellsworth, in *Savings Bank* v. *New London*, 20 Conn., 117, and again in *Carrington* v. *Farmington*, 21 Conn., 72, that taxes are at best arbitrary and unequal. Studied discriminations are made in all tax laws in favor of or against particular persons, or subjects, or trades, or business, or institutions. The character of this kind of legislation, as arbitrary, partial, cumulative, and capricious, is well exemplified in the recent acts of Congress. From the nature of the case there can be no uniform rule of making the assessments. Most commonly the tax is laid upon property. But this is not always the more convenient, expedient, or just mode. A large portion of the national revenues accrues from a tax on incomes, dividends, licences, legacies, stamps, &c., irrespective of property.

In this state, for many years and until very lately, the form of taxing lawyers, physicians, traders, tavern keepers, manufacturers, and mechanics, was to assess them, either at a fixed sum for each respective class, or at the discretion of the "listers." In familiar language this was called "an assessment on the faculty." The present statutes are not free from similar provisions. A capitation tax still remains. The agent in this state of an insurance company existing out of the state, is required, in consequence of being allowed to conduct business here, to pay a certain percentage on the amount of his premiums and collections. Auctioneers and express companies are assessed in a like manner. In the case of quarry, mine, and ore bed companies, (joint stock or incorporated,) not only the stock itself, but the franchise, is expressly made

subject to assessment.   By a law of 1862 it is enacted that for the purposes of taxation no stock of any railroad company shall be estimated in the list at less than ten per cent of its par value, although it was then notorious that much of the stock so to be valued was utterly worthless.

These examples show that the state has ever adopted, at its own will, different bases of taxation as applied to different subjects, and there is no occasion for surprise that the legislature in the matter before us thought proper to impose a tax directly and specifically on these corporations, as such, without reference to their assets.

There is no reason why they should not contribute their full share to support the government through which they exist and flourish.   At first their number and deposits were so small, and their objects and results so beneficent, that they were properly relieved from the common burden.   They have since been found so advantageous, not only to the humble few whose interests they were expected to subserve, but to the public at large, that in this state they have attracted to their vaults nearly thirty millions of dollars.   They act under charters from the state for which other banks formerly paid high premiums.   Their franchise confers privileges of great value.   A corporation is a creature of law, invisible and intangible, and possessing properties by which a succession of persons are considered the same.   It may buy, sell, and contract, sue and be sued, take, hold and transmit property, as though it were a single individual, and that one an immortal being.   Marshall, C. J., in *Dartmouth College* v. *Woodward*, 4 Wheaton, 636.

Over this class of corporations the state keeps careful and continual watch.   It requires that the trustees shall neither receive any pay, nor derive any benefit from the use of the funds, and that they shall render their regular accounts.   It sends its commissioners to examine their condition and protect their interests.   It exempts them from all taxation except the one in question, and a tax on their real estate not

used for banking purposes. The importance of this exemption is very great and is increasing with a fearful rapidity.

In return for these privileges an equivalent is exacted in the payment of a tribute in the form prescribed by statute. There is a difficulty in arranging the mode of taxation adapted to these institutions. It was said by Judge Ellsworth, in the case of *Savings Bank* v. *New London*, 20 Conn., 117, that they have properly "no stock and no capital." They are merely places of deposit where money can be left, to remain or be taken out at the pleasure of the owner. The sums held by them are perpetually changing. On these accounts the legislature established as a rule of assessment the amount of deposits on hand at particular times.

The act of Congress declares that the bonds, treasury notes, and other obligations of the United States, shall be exempt from taxation by or under state or municipal authority. The statute of Connecticut requires that each of the savings banks shall annually pay to the treasurer of the state a sum equal to three-fourths of one per cent on the total amount of deposits in such savings bank, on the first day of July in each successive year. The question is whether this law interferes with the act of Congress. *Unless such an interference clearly appears*, every presumption must be that the state has not violated its duty and exceeded its power.

It is a well-known rule of construction that laws relating to the same subjects shall not be held to be inconsistent with each other, unless the conflict results from the express terms used or from a necessary implication. In this case no difficulty exists in the language of the laws, and very little, as we think, in the meaning and spirit of them. The nation says that its obligations shall not be taxed. The state does not tax them. It lays its hand on the bank itself. It does not allude to any property as such. It provides for no valuation of property. It creates no lien. It directs no sale or forfeiture for neglect of payment. It treats the deposits as a sum of money left with the bank by its owners on interest for a time, and liable at any moment to be withdrawn. It takes no notice of the manner in which this sum may be invested,

or whether it is invested at all; and it never inquires into the profits, or losses, or condition, or prospects, of the bank. If its assets double in value it pays no more; if they decrease one half it pays no less. If they consist partly of forged notes not collectible, no allowance is made; why then should a deduction be claimed when a like part is invested in notes not taxable *merely?*

These considerations prove, as it seems to me, conclusively, that the tax is not imposed on the securities, but on the bank; and it is not imposed on the bank because of its holding the securities, but in consequence of its doing, under favor of the state, certain business which that favor renders profitable. The tax is a payment for the benefit. It is proportionate to the extent of the business, and the amount of the deposits is the index or measure of that extent. The tax stands upon the same ground as that collected of an insurance agent or an auctioneer, as before referred to. It resembles an assessment on a stock and exchange broker, dealing in these securities, not on account of the securities but for the occupation which he pursues; or perhaps more nearly a percentage levied upon a pawn broker, depending upon the amount of his loans, which is certainly no tax upon the heterogeneous articles left with him in pledge. It is hardly more a tax upon property than would be a contribution demanded by a military commander of a captured city, as the price of his protection.

In this case it has been shown that the tax is not only laid upon a legitimate subject, but is eminently just and proper. This fact, however, is immaterial, for the law of the state, not conflicting with the act of Congress, is peremptory and supreme. The legislature may well say, " *Sic volo, sic jubeo; stet pro ratione voluntas.*"

This view of the subject avoids any objection arising from the decisions of the Supreme Court of the United States in the case of *Mc Culloch* v. *Maryland,* and other cases of that class, relied upon by the counsel for the defendants.

But an earnest and a very plausible argument against the state law, is, that it deprives the national obligations of an immunity which contributes materially to their value. The reply to this

is, that such is not the object of the law, nor its direct and immediate effect. The tax is laid, as we have seen, on the corporation for its facilities of business, and not on its assets. The mode is chosen as the best, if not the only one, appropriate to the institutions. Their assets are continually varying in character as well as in amount. The securities pass by delivery. On the day of the required return the bank may be holding none; or it may have a large portion of its deposits thus invested, possibly so arranged for the very occasion, and in reference to the tax. The law is unable to follow these changes, perhaps dodges, and ignores them altogether. The state, in a friendly spirit, allows large amounts from its banks and trust funds to be placed in the national obligations; and this favor probably enhances, as much as the tax lessens their worth.

If the unintentional, remote, and indirect result of the law is, in some degree, to affect their value, surely that circumstance should not be held sufficient to nullify the high prerogative of the state in a matter so vitally important as the taxation of its own citizens, and especially the institutions of its own creation.

Suppose that the state should extort from private bankers, operating, as they do, extensively in government paper, a license tax so onerous as to diminish, or even terminate their business; or suppose that now, as formerly, the statute required that the money of banks, trust funds, &c., should be loaned on interest in such a manner as to exclude the use of national securities; the tendency of these measures would of course be to obstruct a wide channel for the circulation of the paper, close a profitable market against it, impair its credit, and reduce its value. But would the laws be unconstitutional? Would an assessment of a certain percentage upon legacies be inoperative in a particular instance because the estate to be charged consisted wholly or in part of government bonds? And yet the immunity in such a case might add greatly to their demand for the purposes of investment. It is never within the scope of human law to embrace distant and con-

tingent consequences. The connexion between cause and *ultimate* effect is an endless chain.

The conclusion to which we have come corresponds with the decisions elsewhere in similar cases. In Massachusetts a question arose as to the power of the state under its constitution " to impose upon savings banks an annual tax on account of their depositors upon the amounts of their deposits," to be assessed at certain times of the year as provided by the statute. The court sustained the law. Bigelow, Ch. J., after stating some general propositions, says:—"Having in mind these well settled rules of exposition, it appears to us that the assessment imposed by the provisions of the statute under consideration must be regarded as an excise or duty on the privilege of the corporation, and not as a direct tax on money in its hands belonging to depositors." Again:—"If it be objected to this view of the effect of placing an excise on the franchise of savings banks, that it, in its essence and operation, is a direct tax on property because the burden actually falls on depositors, the sufficient answer is, that this result flows from the peculiar nature of the franchise on which the tax is laid." And again:—"The subject to be taxed was the present existing value of the franchise of these corporations, that is, the amount of benefit and advantage which the charter of each bank conferred on those who held it and enjoyed its privileges." *Commonwealth* v. *People's Savings Bank,* 5 Allen, 428.

By the revised statutes of New York in 1830, it was provided that moneyed corporations should be assessed on "the amount of capital stock paid in and secured to be paid in," &c. The courts held in numerous cases that the tax was not on the property but on the corporation. *The People* v. *Commissioners of Taxes,* 23 N. York, 192; *The People* v. *Supervisors of Niagara County,* 4 Hill, 20; *Farmers' Loan & Trust Co.* v. *City of New York,* 7 id., 261; *Bank of Utica* v. *City of Utica,* 4 Paige, 399; *Mutual Ins. Co. of Buffalo* v. *Supervisors of Erie County,* 4 Comst. 442; *Sun Mutual Ins. Co.* v. *City of New York,* 4 Seld., 241; *Bank of Commerce* v. *Commissioners of Taxes,* 25 How. Pr. R., 9. In 1857 the law was changed, and the statute enacted that instead of taxing

the nominal capital, expressed by the words " capital paid in," the officers should assess the capital stock at its *actual value*. In the cases of the Bank of Commerce and the Bank of the Commonwealth, 2 Black, 620 and 635, the Supreme Court of the United States, held—Judge Nelson giving the opinion— that by the law as it stood prior to the act of 1857, (that is, under the law of 1830,) " it was immaterial as to the character or description of property which constituted the capital, as the tax was wholly irrespective of it. The tax was like one annexed to the franchise as a royalty for the grant. But since the change of the system, it is agreed the tax is on the property constituting the capital." And therefore it was held that the securities were exempt from taxation.

The principle recognized in these cases is directly applicable to the case under consideration.

But the course of legislation and litigation on the subject in New York did not rest here. For in 1863, after the decision of the Supreme Court of the United States, in the cases in 2d. Black, exempting the securities—Congress having also, in February 1862, passed a law expressly exempting them when held by a corporation as well as an individual—the legislature of that state enacted that all banks should be liable to taxation, on " a *valuation equal* to the amount of their capital stock, paid in or secured to be paid in, and *their surplus earnings*," &c. Thereupon the Court of Appeals, in the cases of the Bank of Commerce and the Bank of the Commonwealth, decided that the law of 1830 was substantially restored and the securities were not exempt.

These cases were taken to the Supreme Court of the United States, and it now appears (February 1st, 1865,) that the decisions in New York have been reversed, and the securities have been declared free from liability. The opinion is not yet published. But we can not believe that the final settlement of the question before that tribunal will interfere with the determination of this court, as the cases in New York and Connecticut are essentially different. The tenor of our argument points out the difference.

In New York the banks are organized according to a gen-

eral law, and not under particular enactments. They possess capital and stock. The assessment is on a *valuation*, which implies and requires *property as its basis*. The distinction between the assessment of an article at $100, and on a valuation equal to $100, is not very apparent. Indeed the change of the provision in New York is confessedly a sheer evasion of the law of Congress. Not so in Connecticut. Our statute was passed in good faith, without reference and long prior to the national enactment. Our savings institutions, as before stated, are created by special charters, investing them with peculiar powers. They have no stock and no capital. They are in fact large *incorporated agencies* for receiving and loaning money on account of its owners. The assessment is not based on any valuation of property express or implied. It pertains not to ownership but to privilege. It is exacted of the corporation in the nature of a license or income duty as a remuneration for the advantages afforded by the state, and in accordance with a right which the state will not willingly forego.

We advise that judgment be rendered for the plaintiff.

In this opinion the other judges concurred, except PARK, J., who dissented.

PARK, J. The question in this case is, whether the statute of 1862 imposes a tax upon the property of savings banks, or upon the corporations themselves, irrespective of their property.

If it imposes a tax upon their assets, then it is conceded by counsel, and by a majority of the court, that the law conflicts with the constitution of the United States, and the law of Congress, so far as it attempts to tax the investments made by the defendants in the securities of the United States, and is so far null and void. No doubt such would be the consequence. *McCulloch* v. *Maryland*, 4 Wheat., 316; *Osborn* v. *Bank of United States*, 9 id., 738; *Brown* v. *Maryland*, 12 id., 419; *Weston* v. *Charleston*, 2 Peters, 449; *Dobbins* v. *Commissioners of Erie County*, 16 id., 435.

With all deference to the opinion of a majority of the court, I submit that the law in question does tax the property of these institutions, notwithstanding its peculiar phraseology.

It will be conceded that what can not be done directly by the legislature of a state, can not be done indirectly, having in view the same end to be accomplished. Whatever may be the means employed, it is the thing done that characterizes the act. It will be conceded further, that so far as the question in this case is concerned, it is a matter of no importance that the standard of taxable liability is the amount of all deposits on the first day of July in each successive year, rather than the amount invested at that time, for the sum in question was not in the bank of the defendants on the 1st day of July, 1863, but had been invested some time previous thereto. It had passed through the bank, and was then in the treasury of the United States, and the bank held its promises to pay in lieu thereof.

Now how does the case stand ?

The constitution of the United States has been held to declare, and the law of Congress expressly declares, that no burden shall be placed upon the power of the general government to borrow money—that its promises to pay shall go free of taxation, into the possession of every creditor of the government, and shall remain free. This exemption from taxation is in the nature of a premium, to induce all persons, natural and artificial, to loan their money to the government. The defendants have loaned the government more than five hundred thousand dollars, and if the law in question be constitutional, it is impossible to conceive how or wherein they or their depositors, the real creditors, have been benefited or are likely to be, in the slightest degree, by the exemption. The amount of the defendants' tax is precisely the same to all intents and purposes as it would have been if the law had imposed the tax directly upon the property of the defendants. Will they not see, and will not other savings banks see, where they have in contemplation the loaning of large sums of money to the government, under its many and pressing calls, that this exemption from taxation is a sound without meaning ? And

will they not be deterred to a certain extent, and the credit of the government burdened to just that extent?

If this law be constitutional it is not easy to see why every creditor of the general government may not be taxed in a similar manner. Suppose the legislature should pass a law that all persons who have loaned money, or invested the same in stocks of any kind, or who should thereafter do the same, shall make annual return to the comptroller of public accounts, of the total amount of all such sums of money which remain invested on the 1st day of July in each successive year, and that every such person shall annually pay to the treasurer of the state a sum equal to three-fourths of one per cent on the total amount of all such money. Suppose a person should make return that among other investments he had loaned the general government ten thousand dollars. Wherein does his case differ in principle from the one under consideration? No one will doubt the power of the legislature to tax individuals, and to discriminate in imposing such tax. It might be said in such a case, with equal propriety, that the law does not impose the tax upon the property of the individual, but upon the individual himself—upon his capacity to make money. It might be urged that the law does not tax the property of the individual, because it takes no account of the value of his investments. Should they be worth twice or thrice the amount invested, he pays no more; if not half the amount invested, he pays no less. If he has unwisely invested largely in worthless paper, or forged notes, they are not to be taken into consideration in ascertaining his taxable liability, but it is to be ascertained by a fixed, arbitrary, arithmetical calculation—three-fourths of one per cent on the total amount of money invested. It might be urged that where the law imposes a tax upon property, it usually provides a mode of valuation of such property, and creates a lien enforceable by distress and warrant, but no such provisions exist in the supposed law. These are the principal arguments used by the majority of the court, in coming to the conclusion that the law in question does not impose a tax upon the property of the defendants, but upon the defendants themselves. But

wherein does the present case differ in principle from the one supposed ? What argument could be used in support of the present law, that could not be used with equal force and effect in support of the supposed one ? If the law be constitutional in the one case, it is not easy to see why it might not be in the other ; and if so, then the capacity of the general government to borrow money at home, is at the mercy of the several states ; for the right to tax carries with it the right in effect to prohibit.

Again, suppose a natural person stood in the place of the defendants, and all the sums of money deposited with the defendants had been deposited with him, to invest as he should think best, for the interest of the depositors, and he had invested such sums in precisely the same manner that the defendants have. Suppose the law had included such a case, and said that he should pay a sum equal to three-fourths of one per cent on the total amount of all such deposits. If the present law be constitutional, it is manifest it would have been if it had gone as far as the case supposed.

Savings banks stand in a similar relation with their depositors. They receive sums of money to invest as they shall judge best, for their interest. The money they receive is not expected to remain in the bank, but to be immediately invested. It may be that the five hundred thousand dollars in question passed directly through the defendants' bank into the treasury of the United States. The defendants act as agents, and whatever securities they have they hold as trustees. *Savings Bank* v. *New London*, 20 Conn., 111.

The case I have last supposed is perfectly legitimate. All that prevents men of great financial ability from establishing agencies of the kind, that would in process of time be co-extensive in business with that of any savings bank in the land, is the fear of the public that the integrity of no one man would be sufficient to withstand the temptations to which he would be exposed.

Much reliance is placed upon the peculiar phraseology of the law in question. That is doubtless owing to the anxiety of the legislature to avoid every constitutional objection ; for

what other reason can be given why they should say that these institutions shall pay a tax " equal to three-fourths of one per cent." Why not say directly, that they shall pay three-fourths of one per cent on the total amount of all their deposits? The latter expression is the most natural. The other is studied and shows a design in using it. But can so slight a change in the phraseology make such difference in the result, that the one is constitutional and the other not?

For a similar reason, no doubt, the deposits are taken as the standard of taxation, rather than the amount invested. The legislature knew that such institutions never keep money on deposit more than is absolutely necessary. All their income is derived from investments. But whether the one standard is taken or the other can make no difference.

A majority of the court have relied very much in coming to the conclusion that the law imposes a tax upon the institutions themselves, and not on their property, upon the fact that the law makes no provision for the valuation of their investments, and consequently takes no account whether they are of greater or less value than the sums invested. This may be owing to the reason I have already expressed—the anxiety of the legislature to avoid coming in conflict with the constitution of the United States, or it may be owing to a desire to avoid unnecessary trouble and expense. It is well known that many stocks are above their par value and many below, and should inquiry be made in relation to the value of the investments made by these institutions, many would be found worth more than the sums invested, and many less. The one would offset the other, and the result would vary but little from the amount invested. At all events, it is manifest the legislature considered that these institutions were worth at least the amount of their deposits, and that amount was therefore assumed to be the value of their property ; for no other reason can be given why the deposits are made the basis of taxation. The law shows an intention to tax these institutions in an equal and just proportion ; but, if the deposits have no relation to property, how is this accomplished ? A capitation tax ignores property, and demands of every man a fixed sum,

no matter how rich or poor he may be ; but this law does not require of each of these institutions a fixed amount, but a sum in proportion to the amount of its deposits. It therefore must assume that the deposits bear a relation to its property, and for the purposes of taxation are equal to the value of its property. If this be so, then no matter whether the amount of property that a particular institution is assumed to possess is strictly in accordance with the fact or not, for the legislature had a right to assume what it pleased, and the tax is none the less a tax upon property, or the basis of property.

Now wherein lies the difference between a tax upon property, and a tax upon the person measured by the amount of his property ? In either case the property is the foundation and moving cause of the tax. If a person has no property he has no tax. If he has small or large possessions his tax is small or large in proportion. The difference is in form and not in substance.

Suppose a person should invest the sum of one thousand dollars in United States securities, and the legislature of the state should say to him in the form of a law, " inasmuch as we can not tax you for the money loaned to the general government, you as an individual shall pay a sum equal to the tax on one thousand dollars, vested in taxable securities." Would such a law be in harmony with the constitution of the United States and the law of Congress ? It might be said that the law does not tax the sum loaned ; indeed it expressly declares it does not, but imposes the tax upon the individual. But it would be said the intent is too obvious. It is in form a tax upon the individual, but in substance a tax upon the sum loaned. And so it seems to me is the case under consideration. It is in form a tax upon the institutions, but in substance it is a tax upon their property ; and it is the duty of courts to look through the form to the substance, through the shadow to the reality. *Brown* v. *Maryland*, 12 Wheaton, 419. These considerations are strengthened by the fact that in no instance heretofore has the state taxed the franchise of any corporations. Such a system of taxation has never been known in the state, and surely it is marvelous that it should

commence with this class of corporations, whose charters are not valuable.   Indeed, the same statute that imposes the tax in question imposes taxes upon the property of all other corporations.   Why should discriminations be made in relation to savings banks and building associations ?

It is said by a majority of the court, that these corporations have been the favorites of the state—that they have been nurtured and reared and petted by the legislature, and well may they tax them for the indulgence they have received. Such considerations go to show that these institutions are the proper subjects of taxation, but they throw no light upon the subject of inquiry, whether this law in fact imposes a tax upon the franchise or the property of these institutions.   In either mode the legislature has unlimited power to tax them in a constitutional way.

A case more in point than any other that can be found has recently arisen in the state of New York.   The legislature of the state in April, 1862, passed a law in these words :— " All banks and other moneyed corporations shall be liable to taxation on a valuation equal to the amount of their capital paid in, or secured to be paid in, and their surplus earnings, &c."   The Bank of the Commonwealth had a capital paid in and secured to be paid in, of seven hundred and fifty thousand dollars.   After deducting the value of their real estate, in accordance with certain provisions of the law, it was found that the balance of their capital, amounting to more than five hundred thousand dollars, was invested in the securities of the United States.   The question was whether the amount so invested should be deducted in computing the amount of their tax.   The case went to the Court of Appeals and was there decided against the bank.   It subsequently went to the Supreme Court of the United States and has there been decided, since the decision was rendered in this case, by a reversal of the decision of the Court of Appeals.

Chief Justice Denio, in giving the opinion of the Court of Appeals, uses the same arguments that are used by a majority of the court in the present case.   He says :—" It would seem plain enough that it is entirely immaterial what the assets of

the bank then are. If the amount of the original nominal capital is alone to be taken into account, it would be officious and improper, or at least useless, for the assessors to make any examination or enquiry into the actual assets. The tax is not assessed upon the property or capital possessed at the time the annual inquiries are made by the proper officers, but upon the amount originally contributed to the corporate enterprise. This was fixed upon somewhat arbitrarily, it may be said, as representing with sufficient practical accuracy the sum upon which the public burdens ought to be assessed. We have seen that if the sum of this original contribution should be diminished to any extent by losses or depreciation of securites, no corresponding diminution was to be made in the assessed valuation. The reason for this was that the existing assets formed no part of the subject by which, according to the statute, that valuation was to be determined. Another criterion, namely the original capital, was to be taken as representing the taxable value. This reason equally excludes any inquiry into the existing assets, with a view to ascertain whether any part of them are in their own nature not subject to taxation. If it could be shown that the discounted paper held by a bank, or the currency notes in its drawer, were forgeries, the assessors would not regard that circumstance, because the assets do not enter into the question and are no part of the data by which the taxable valuation is to be ascertained. And for the same reason when it was shown on behalf of the bank that its securities were not in their nature taxable, the circumstance became utterly immaterial, since neither the character nor amount of such securities have anything to do with the question which the taxing officers were to determine." The case referred to seems much stronger in favor of taxation than the one under consideration, from the fact that the bank had capital stock, and the tax is imposed upon the money paid for such stock ; here it is imposed upon money deposited for the purpose of investment, and to be withdrawn from the bank, at the will of the depositors, in accordance with its by-laws.

I am of the opinion that the amount invested by the defendants in the securities of the United States should be deducted in computing the amount of their tax.

---

# SUPREME COURT OF ERRORS.

## NEW HAVEN COUNTY, SEPTEMBER TERM, 1864.

### Present,

HINMAN, C. J., DUTTON, McCURDY AND PARK, Js.