Hon. THOMAS C. MANNING,

---

### No. 8374.

SAMUEL H. KENNEDY VS. THE NEW ORLEANS SAVINGS INSTITUTION.

Claims acquired by a debtor against his creditor, with full knowledge of .the latter's notorious insolvency and for the purpose of obtaining an undue preference, cannot be set up by the former in compensation of his indebtedness, although the insolvency had not been previously judicially declared.

Courts of justice cannot be asked to create a transaction or condition of things, which the law reprobates and forbids and which they would have undone, if called upon to do so.

APPEAL from the Civil District Court for the Parish of Orleans. *Houston,* J.

---

*Thomas J. Semmes* and *H. E. Upton* for Plaintiff and Appellant:

1. Samuel H. Kennedy, on the thirty-first day of March, 1879, obtained the writ of sequestration, from the late Fifth District Court of the Parish of Orleans, under which writ the civil sheriff seized and took into his possession certain mortgage notes, which he now holds, under said writ. The mortgage notes were. at the date of the issuance of

the writ of sequestration, in the possession of David Urquhart, president of said Institution. The writ of sequestration issued prior to the rendition of the judgment, by the United States Circuit Court, appointing receivers to take charge of the property and effects of said New Orleans Savings Institution. On the day that the writ of sequestration issued a real tender was made to the New Orleans Savings Institution of the full amount due by said Kennedy on said mortgage notes. This tender was validly made, followed by a consignment, and had the effect of a full and complete payment. R. C. C., Art. 2167; Walker vs. Brown, 12 A. 266.

2. Sequestration is defined to be a mandate of the court, ordering the sheriff, in certain cases, to take into his possession and to keep a thing, of which another person has the possession, until after the decision of a suit, in order that it be delivered to him who shall be adjudged entitled to have the property or possession of that thing. Obligations and titles may be sequestered when their ownership is in dispute. R. C. C. Arts. 269 and 272.

3. In ordinary cases of attachment, or when a judicial sequestration is necessary, the law has provided an officer—to-wit: the sheriff—to take care of the property seized; but he is to act only in the event of the parties failing to appoint a fit and proper sequestrator or keeper of their own selection. 4 R. 517, 524; 11 R. 418; 11 M. 462, 522, 523; Meshew vs. Gould, 30 A. 163; Levy vs. Penny, 11 A. 540.

4. Compensation takes place by the mere operation of law, even unknown to the debtors. The two debts are reciprocally extinguished as soon as they exist simultaneously to the amount of their respective sums. R. C. C. 2208 (2204); 4 A. 157; 15 A. 165; United States Reports, S. C., vol. 95 (5 Otto), pages 177 and 178; 5 Mason's Reports 212; 2 Otto 362, High on Receivers, sec. 247, pages 163 and 164; Waterman on Set-Off, 2d edition, pages 16 and 17; Morse on Banks and Banking, page 41.

5. No proceeding has ever been instituted by the State to enforce the forfeiture of the charter of the New Orleans Savings Institution. It has never been divested of its corporate character and capacity. Its insolvency has never been judicially ascertained and determined. 5 R. 63; 5 A. 179; 16 A. 28, 29; 31 A. 63; Atchafalaya Bank vs. Dawson, 13 L. 497; State ex rel. Lannes vs. Attorney General, 30 A. 958; the State of Louisiana vs. Citizens' Savings Bank, 31 A. 836; Baker et al. vs The Louisiana Portable Railroad Company, 34 A. 754.

6. The New Orleans Savings Institution has been held by this Court to be a bank. 32 A. 531.

7. Our law differs from the common law doctrine, that where a check has been presented to and acceptance refused by a bank, there being no privity, the holder of the check can not sue the bank. *A check duly notified to the bank constitutes an equitable assignment of the fund against which it is drawn.* Case vs. Henderson, 23 A. 49. Overruled. *Obiter.* There is no distinction to be made between the irregular deposit of the customer with his factor and that of a depositor with a bank. Bank vs. Coates. 12 Reporter 514; Jackson vs. Tiernan, 15 La. 485; Gordon & Gomila vs. Muchler, 34 A. 604; R. C. C. 2642 to 2654; Clark vs. Clark, 108 Mass. 522.

8. No provision in act No. 239 of 1855, entitled an act "to incorporate the New Orleans Savings Institution," or the act of 1857, amending act No. 239 of 1855; or in act No. 105 of 1878, page 157, entitled an act "to extend the charter of the New Orleans Savings Institution, with amendments," providing the mode and manner of its liquidation, in the event of its becoming necessary. There is no general law under which proceedings could have been had for its liquidation. The only statutes under which its affairs could have been legally liquidated and settled are the acts of 14th and 26th March, 1842, and 5th April, 1843. They are special laws for special purposes, and are to be construed together as in *pari materia* and apply alike to solvent and insolvent banks. These acts

are in full force and effect. 31 A. 837. The second section of the act of 5th April, 1843, is in the following terms : "*It shall be the duty of each of the banks of this State, at all times, to receive, in set-off or part off-set of debts due to it, its own debts, when liquidated or past due, whether for circulation, deposits or arising from any source whatever, and whether such banks be or not in liquidation, and without reference to the date at which the debtor offering such tender may have acquired the claim by him offered in off-set.*" *The terms of these laws are general, and apply to all the banks of the State,* whether in liquidation or not; to those which still retain their charters, as well as to those which have lost theirs and are in a train of liquidation. The Commissioners of the Exchange and Banking Company of New Orleans vs. Enoch R. Mudge and another, 6 R. 396 and 397.

## Robert Mott, Henry B. Kelly and E. M. Hudson for Defendant and Appellee :

1. The proceeding by sequestration in this case is irregular, and not warranted by law. The mortgage debtor is not, upon the bare averment that his liability upon a mortgage note has been extinguished by one of the causes specified in article 739, C. P., and that he fears that the mortgage creditor will conceal, part with or dispose of the note when the note has matured, entitled to have the evidence of indebtedness sequestered out of the hands of the creditor, so as to thereby prevent him from resorting to executory proceedings to enforce the mortgage, but should be remitted to his right to avail himself of the alleged ground of extinguishment of the mortgage debt in any action which may be brought thereupon by the creditor or his transferree, after maturity.

2. The Circuit Court of the United States for the District of Louisiana, having acquired jurisdiction *ratione personarum* of the suit of Larroque *et al.* vs. The New Orleans Savings Institution, had a right to decide every question arising in that suit, and having decided to assume charge of the liquidation of the affairs of that institution upon averments of insolvency and dereliction, and to appoint receivers of its effects, the correctness of its decision cannot be questioned here. Dillon, removal of causes, p 20; Elliott vs. Piersol, 1 Pet., 340; Wayman vs. Southard, 10 Wh.. 49; Livingston vs. Story, 9 Pet.. 362; Robinson vs. Campbell, 3 Wh.. 222; Payne vs. Hook, 7 Wall, 430.

3. The proceedings in the Circuit Court were regular and proper in the exercise of its jurisdiction as a court of chancery, the suit of Larroque *et al.* vs. The New Orleans Savings Institution falling plainly within the equity jurisdiction of the court. Morawaetz on Private Corporations, p. 632; Gaylord vs. Receivers, quoted in High on Receivers, p. 39, n. 2

4. Claims against an insolvent, acquired after insolvency, cannot be compensated against debts due to the insolvent prior to and at the time of insolvency. Nor can exemption from the general rule be allowed in this case under the exception thereto established by Act 157, of 1842, and Act 92, of 1843. Maunsel de Paillat, 7 Ed. 1286 ; 3 Larombière, p. 718, Nos. 7 and 8; 2 Zachrié, p. 413, No. 32; 7 Toulliér, No. 381; Journal du Palais, Table Complementaire, Part II, *verbo* Faillite, Nos. 4, 5, 194. 195; Bossier's Syndic vs. Belair, 1 N. S. 484; Kenner's Syndic vs. Sims, 6 N. S. 66.

5. A Savings Bank is only an incorporated agency for receiving and investing money of depositors and if a loss of deposits is incurred, one depositor cannot maintain an action against the bank to recover his share. The remaining assets belong to all the depositors. One has no better right to be paid at the expense of the others than another. And if a depositor in such bank is indebted to it as a borrower of its funds, he cannot, in case of insolvency of the bank, offset his deposit against his debt due to the bank. Burrell vs. Savings Society, 38 Conn. 203 ; Osborn vs. Byrne, 43 Conn. 156.

The opinion of the Court was delivered by

BERMUDEZ, C. J. On the averment that four certain notes of his, secured by mortgage and once owned by the defendant Institution, have been paid in part, and extinguished otherwise by compensation, by operation of law; that the said notes are in the possession of the defendant, who refuses to deliver them and who may dispose of the same, the plaintiff has obtained a sequestration thereof, praying that, in due course, they be returned to him as his property.

From an adverse judgment, the plaintiff has appealed.

The facts disclosed by the record are the following:

On the 31st of March, 1879, the defendant Institution held four mortgage notes of the plaintiff, each for $5000, on which $2500 had been paid and on which $17,500 appeared to remain due.

On the same day, the plaintiff tendered to the defendant, in extinguishment of the debt thus owing:

1. All his rights, title and interest in and to the deposits figuring to the credit of two different deposit accounts, evidenced by a transfer to him by the depositors of the latter's claims to such deposits and by checks drawn by them against the funds represented by the pass books, for $16,658 38.

2. In cash, the sum of $841 62, being the difference between the amount of the deposits and the amount due on the notes ($17,500).

The Institution refused to accept the pass books, checks and cash in payment of the notes and to deliver the notes. The plaintiff thereupon deposited the books, checks and cash in a bank, subject to the order of the Institution and gave written notice to the latter of the deposit thus made.

The plaintiff then obtained the sequestration of the notes, which since March, 1879, have been, in some way or other, in legal custody. 32 A. 1232.

It appears further from the record, that on the 28th of February, 1879, the Institution, after being almost drained by a *run*, suspended payment and gave public notice of its inability to pay its deposits.

On the 20th of March, 1879, a bill in equity was filed in the United States Circuit Court for this district, by a foreigner who was a depositor for a large amount in said Institution, alleging the insolvency of the same and praying for its dissolution and liquidation by a receiver.

On the 31st of March, following, the Court appointed receivers, who qualified on the same day and subsequently took possession of the property of the concern, realizing and distributing the proceeds thereof among the creditors, according to their respective rights.

The consideration given by the plaintiff to Pierce Butler and the estate of Ann Butler, the depositors aforesaid, for the amount of deposits figuring to their credit on the books of the company and of their own pass books, namely, $16,658 38, and for the checks thereagainst, was plaintiff's own check for $5830 50; that is, thirty-five per cent of the whole amount, and an agreement to pay fifteen per cent more in case he should use the books.

The purchase of the rights of the depositors took place on the 29th of March, 1879, a month after suspension and advertisement and two days before the tender already stated was made.

At that time, the Institution was not a creditor of either of the Butler depositors.

Great ingenuity and learning was displayed during the argument of the case, to show that the claim of the Institution, evidenced by the notes, had been or had not been extinguished by compensation by operation of law, it being admitted, however, on both sides, that the defense was good or bad according as the claim of the depositors were acquired *before* or *after* insolvency, with this distinction, however, that the plaintiff claimed that the insolvency had not been judicially declared and that this was essential to debar compensation; while the defendants urged that it was enough if the insolvency was actual and to the knowledge of the plaintiff; but that, anyhow, the insolvency had been judicially admitted and that this fully satisfied the requirement, if valid in law.

Hence it is that the learned counsel indulged in argument in the discussion of the often mooted proposition which does not seem as yet finally decided by unquestionable superior authority: Whether service of process, or seizure of property, confers jurisdiction.

It is not deemed necessary to discuss and determine whether the appointment of the receivers retroacted to the date of the filing of the bill in equity and whether the jurisdiction of the Circuit Court attached from that time.

It cannot be denied that, if on the day of the filing of the bill in equity (March 20, 1879), the Circuit Court had appointed receivers, and that these had taken possession of the assets of the Savings Institution, deemed as an insolvent concern, at any time before the purchase by plaintiff (29th of March, 1879) of the rights of the depositors, the claim in compensation could not have been set up, for it is too clearly settled by a number of indisputable authorities, which it is unnecessary to enu-

merate, that compensation or set-off is not admissible where the credits or claims set up have been acquired *after* a surrender or cession judicially accepted or an insolvency judicially declared.

Conceding, therefore, that proposition, and yielding further, that on the 29th of March, 1879, the insolvency of the Savings Institution had not been judicially declared and that it *then* and. on the 31st of March following, when the sequestration of the notes took place, still was under the control of its regular officers and had possession of all its assets, the question which arises and which, after all, is the only one to be solved in this controversy, is: Whether the claim of the Institution for the amount due on the notes can be compensated by the drawer and debtor thereof, with claims against it, purchased after its insolvency had become notorious and was well known *to him ?*

We deem it unnecessary to consider and determine whether Pierce Butler and the estate of Ann Butler, who were depositors, and as such, creditors, before the insolvency of the Institution had been ascertained, could or not themselves have pleaded compensation by setting up their deposits in partial or total extinguishment of a claim of the Institution against them, if any had existed. That state of facts is not presented and the formal decision of the question is not useful in this controversy.

The difficulty, then, which is to be solved is, whether, under the law of Louisiana, a debtor can set up in compensation, by operation of law, of the claim of his creditor, *at par*, debts of the latter, acquired after that creditor has become actually and notoriously insolvent and has practically failed, although his insolvency or failure has not been followed by a judicial surrender or cession of property.

Before entering into the discussion of that question, we think it proper to dismiss at once from consideration the defense that such compensation can be pleaded successfully under the provisions of the bank acts of 1843. In relation to that subject, it is sufficient to say that such legislation referred to a class of banking institutions in existence at the time, or of similar ones susceptible of subsequent life. It did not enter into the mind of the Legislature to provide for money organizations which were then hardly known, are no kindred to those in contemplation, and are not therefore reached by the acts in question.

Proceeding now with our inquiry, let it be supposed for a moment that, instead of meeting plaintiff's demand with a refusal, as it did, on the 31st of March, 1879, the Institution then, under the control of its officers, had accepted in payment of the notes the pass books, the checks and the cash offered, and had surrendered the mortgage notes; and that some time later, surely within a year, the receivers had instituted

suit against the plaintiff, stating the facts occurred, asking the nullity of the transaction and payment of the notes ($17,500) and the plaintiff here, the defendant there, had answered, maintaining the validity of the transaction and his right to the notes, what would have been the character of the action?

Would it not be that of actions which the law gives to creditors or to their representatives, to revoke the acts of their debtors, injurious to them, under certain stated circumstances?

Undoubtedly.   And would not the issues then presented have had to be determined under the empire of principles and laws which should and do govern in actions of the nature of that now before the Court? Assuredly.

The substantial charge and ground of complaint in the case of such revocatory action by the receivers of the Savings Institution, representing all those concerned in it, would be that their debtor (the Institution) had received in payment, *at par*, of a valid, active claim due it and worth every cent of its face, a counter claim which is not *money, worth* only about one-third of its face, from one who was aware of its insolvency, and that by such transaction, which is forbidden by law, they have sustained injury.

In such a case, the material questions to be solved would be:

1. *Did* the creditor of the concern *know* of its insolvency?

2. Has he satisfied the claim of the Institution against him *in money?*

If he knew of the insolvency and did not pay *in money*, the receivers would be entitled to a rescission of the transaction, and to recover the amount of the notes, less the *actual* dividends declared on the credits purchased against the Institution, and actually ready for payment.

The law gives to every creditor where there is no cession of goods, as well as to the representatives of all the creditors, where there is any such cession, or *other* proceedings by which they are collectively represented, an action to annul any contract made in fraud of their rights. R. C. C. 1970.

This action can only be exercised when the debtor has not property sufficient to pay the debt of the complaining creditor, or of all his creditors, when there has been a cession or *any* proceeding analogous thereto.   R. C. C. 1971.

No contract shall be avoided by this action but such as are made in fraud of creditors and such as, if carried into execution, would have the effect of defrauding or injuring therein.   If made in *good faith*, it

cannot be annulled, although it prove injurious to the creditors; and although made in bad faith, it cannot be rescinded unless it operate to their injury.   R. C. C. 1978, 1989.

Every contract shall be deemed to have been made in fraud of creditors when the obligee *knew* that the obligor was in insolvent circumstances and when such contract gives to the obligee, if he be a creditor, any advantage over other creditors of the obligor.   R. C. C. 1984.

By being in insolvent circumstances is meant that the whole property and credits are not equal in amount, at a fair appraisement, to the debts due by the party.   R. C. C. 1985.

Not only contracts which dispose of property, but all others which are made in fraud of creditors and deprive them of their recourse to the property of their debtor, come within the provisions of the law.   R. C. C. 1989.

No *payment* of a just debt *in money* shall be affected by the action, although the party was *in insolvent circumstances* and the person to whom he made the payment *knew* of such insolvency.   R. C. C. 1986.

Any debtor who shall, within three months next preceding his failure, have disposed of his goods and effects, in order to give an unjust preference to one or more over the others, shall be debarred from the benefit of the insolvent laws and the acts shall be declared null and void.   R. S. 1808.

The word *failure* used in the Code, signifies the situation of the debtor who finds himself in the impossibility of paying his debts.   *Solvency* is the ability to pay one's debts.   He who cannot pay all that he owes, is not solvent.   R. C. C. 3556, 11, 26.

If the act consist merely in the endeavor to obtain a preference over other creditors, the party shall lose the advantage to be secured by the act, but shall be reimbursed what he may have given or paid and he shall restore all advantages he has received from the transaction.   R. C. C. 1983.

The foregoing are the principles which should be invoked for the decision of a cause like that submitted in the present instance.

Under the textual provisions of the law, it is manifest that it is not indispensably necessary that an insolvency or failure of a debtor be judicially declared or that he should make surrender or cession of property to entitle his creditors or their representatives to annul any act done in fraud and to the injury of their rights.   It is sufficient that he be in the impossibility of paying his debts; that the party who

claims to have been benefited *had knowledge* of his circumstances and if he were allowed his pretensions he would obtain an undue preference to the injury of the other creditors.

It is apparent that the plaintiff in this case *knew* of the failure and insolvency of the Institution. He was informed of it by public advertisement, by the proceeding in equity, and he purchased privileged rights against it at thirty-five cents on the dollar, which he seeks to have received *at par*, in payment of his debt to the concern. If this were done, the other depositors, creditors of the concern, to whom all the assets belong, would sustain an injury of at least sixty-five per cent of their interest in one of those items, the notes due by plaintiff and would be far from being paid in full, while the plaintiff's claim would be, or nearly so.

It has been well said that Savings Institutions are incorporated agencies for receiving and loaning money on account of the owners. They have no stock, no capital. They are places of deposit, where money can be left, to remain or to be taken out at the pleasure of the owner. 32 Conn. 173.

They are corporations created for the benefit of the poorer classes, to induce them to be careful, saving and prudent. They pay interest or dividends, when any are earned, to the deposits, whose money is invested, and made productive.

The depositors become *partners* and stand in the attitude of and have the same interest as stockholders. Then funds are placed together, to be invested in the securities designated by the organizing law and are entitled to share the profits in the proportion which their deposits and other deposits bear to the profits realized. The corporation is their agent, representing their interest collectively and individually.

In the case of Bunnell vs. Collinsville Savings Society, 38 Conn. 203, in which a depositor was seeking to recover twenty-four per cent with which the company had credited his action, as his share of losses maintained, the Court said, speaking of such institutions:

"Their assets consist of loans of money made by them for the benefit of their depositors, from whom the money was derived. In case of loss, they have no property out of which it can be paid and if the claim of the plaintiff is correct, these Institutions would have to go into insolvency and wind up their affairs whenever a loss occurs, however small it may be; in which case depositors would have to bear their proportion of the loss. Had this institution wound up its affairs in conse-

quence of that loss, the plaintiff would not have received any portion of the sum which he now seeks to recover, for his proportion of the loss would be the sum now in controversy. Why should he be benefited because the defendant did not go into insolvency? He knew when he deposited his money that he was placing it at hazard. He put it into the hands of the defendant to be used substantially as his agent for his benefit and, in the use, so much of it has been lost. What ground has he to complain? The assets this Institution now has belong substantially to the present depositors. How can he obtain his loss? Shall he be paid out of their money? Substantially, he has lost the sum he now seeks to recover by his own act, through the instrumentality of his agent and he has no right to complain."

In Osborn vs. Byrne, decided later by the same court (43 Conn. 156), the question presented was, whether a debtor to a Savings Institution, who, at a time when it was generally believed throughout the community that it was insolvent, had purchased *at par* a deposit claim against it, could set-off that deposit claim against his indebtedness to the bank.

The learned Court, after referring approvingly to previous opinions of its own touching the character of Savings Institutions and the relations between them and the depositors of money therein (32 Conn. 173; 38 Conn. 203), say:

"The deposits and the loans are wholly independent of each other, so much so, that it does not appear that the one was made in consequence of the other. * * * The debts which depositors owe to the Institution in form, belong in fact to all the depositors, but neither of the depositors, nor the Institution, owe them anything more on their deposits than their just proportion of the value of the assets that the Institution owns. The difference in amount has been lost by these parties, through the instrumentality of their agent, and they have no right to require that the loss shall fall on the other depositors, who have already suffered in the same way and to the same extent.

"The depositors in Savings Banks bear the same relation to each other and to the assets of the bank that stockholders in other monetary institutions do to each other and to the property of the bank. Disastrous investments affect each in the same way, and in case of insolvency, all a party who owns deposits in the one case, or stock in the other, can claim, is his just proportion of what remains at the final winding up of the Institution."

The case then presented and decided was one in which the deposits had been purchased *at par*, therefore, at a time when the suspected

embarrassment of the concern had not affected the value of the deposits with it. How stronger the case of the purchase of such deposits at *one-third* of their face or nominal value and one month after the insolvency of the concern had become a matter of public notoriety.

The same principle recognized by law, existing in Louisiana, which authorizes the revocation of acts done by an insolvent, where bad faith resulting from actual or constructive fraud exist, and where injury has been done to the creditors, prevails, and was recognized in Massachusetts a few years ago by the able Supreme Court of that State.

The Court then said:

"The case discloses a purchase of demands against an insolvent under circumstances that should prevent the purchaser from availing himself of them in *set-off* against a debt due from him to the insolvent and sought to be recovered by the assignee of the insolvent for the purpose of general distribution among his creditors. The present case differs from that of Aldrich vs. Campbell, 4 Gray, 284, where such purchase was made in good faith and unaccompanied by circumstances to show a knowledge that the purchase would operate to defeat the purposes and provisions of the insolvent laws. The whole arrangement, * * * preceding and connected with the purchase of these demands from creditors of the insolvent, indicates the purpose to interfere with the proper distribution of the estate of the insolvent, and is contrary to the spirit of the insolvent laws.

"To allow this *set-off* would not be consonant with equity and justice to the parties interested, would directly tend to defeat an equitable distribution of the assets among the creditors generally, and would enable a debtor of an insolvent, one notoriously so, and who was about to become the subject of proceedings in insolvency, to give a preference to such creditors of the insolvent as he might be disposed to favor, making the debts available to the whole amount due, if the purchaser pleased to take them at that rate, as he might well do if he was to be allowed their full amount as an available set-off against his own debt by the insolvent, or what would be equally objectionable, to allow the debtors of the insolvent to discharge their liabilities by a set-off acquired by purchasing the depreciated debts of the insolvent at a large discount from their nominal value." Smith vs. Hill, 1877-8, Gray, Mass. 573.

In the subsequent case of Colt vs. Brown, 12 Gray, Mass. 233, which was an action by receivers of a bank upon a debt contracted before the institution of proceedings against the bank, the defendant was denied the right to set-off debts purchased since their commencement.

Shaw, C. J., there said:

"To allow the *set-off* would be inconsistent with the intent and spirit of the statutes, and would essentially effect a preference in favor of debtors to the bank, by enabling them to pay in a depreciated medium." Atlas Bank vs. Nahant Bank, 23 Pick. 480; Makepeace vs. Coates, 8 Mass. 451; Crease vs. Babcock, 10 Met. 525, cited.

In his valuable work on Private Corporations, Morawetz, p. 581, § 581, says:

"It seems clear, upon general principles, that an insolvent corporation which has ceased to carry on business, cannot distribute its assets unequally, and prefer certain creditors at the expense of others. The equitable lien of the creditors upon the corporation assets is for the benefit of all the creditors equally, and if the corporation can divest that lien so as to prefer one creditor to another, this must be done by virtue of the powers of management with which the company and its agents have been intrusted. The creditors of a corporation must necessarily be held to have consented that the company's assets may be used by its agents in order to carry on the business, and to further any of the purposes for which the company was formed."

In Sawyer vs. Hoag, 17 Wall. 610, Mr. Justice Miller said:

"As soon as the company became insolvent, and this fact became known to the appellant, the right of set-off for an ordinary debt to its full amount ceased. It became a fund belonging equally, in equity, to all the creditors and could not be appropriated by the debtor to the exclusive payment of his own claim." See also, 3 Barr. Pens. 470; 6 Barr. Pens. 420; 60 Ga. 174; and others cited in note of Morawetz at foot of sec. 581.

From all those authorities, it appears that the principle recognized and applied is, that the law which has the power to annul a transaction has likewise the virtue of preventing the same, and consequently debts purchased with knowledge of the debtor's insolvency and reason to believe he is about to go and be driven into insolvency and notice to the debtor of the purchase, cannot be set-off on an action on the debt due from the purchaser to the debtor.

Coming back to the case before us:

What is it that the plaintiff acquired from Pierce Butler and the estate of Ann Butler when he purchased their rights as depositors? He acquired all the rights which they *then* had, or *might subsequently have*, against the Institution; that is, *actual* and *eventual* rights. What were those rights? Rights to be paid their deposits out of the proceeds of

the assets of the insolvent concern, *in full*, if the same proved sufficient; *in part*, in case the same were inadequate.    Pierce Butler and the estate of Ann Butler could not have sold to the plaintiff more rights than they possessed and which were nothing more than an interest as partners in the common fund and its accretions, even if the Institution had not suspended.

The rights of all the depositors who may be received as partners or stockholders, that is, their interest in the Institution, became fixed the moment that the corporation suspended.    The depositors become owners in common of all the assets and entitled to share the same, after payment of privileged debts, in the proportion which their respective deposits bear to the net amount ultimately to be realized.

It is this interest of theirs which the Butlers transferred to the plaintiff and which he acquired.

As the purchase was made after the known insolvency or failure of the Institution, the rights acquired cannot surely be set up in compensation in full extinguishment of the liability under the notes.

Compensation did not take place *proprio vigore*, as a matter of right under the Roman law.    It was allowed its effects when differences arose, but only after judicial determination.    Emancipation from such restraint as a condition precedent for reaping its advantages and the instantaneous vivification of its consequences, even when unknown to the mutual debtors, is of Gallic creation.    The principles of the modern civil law on the subject have been transplanted in the common law and set-off or compensation in that system is now regulated by the rules of the civil law.

It is an equitable remedy, which originates in and rests upon good faith.    It is not permitted when its operation would involve a deception and a disappointment of the just expectation and confidence of the party against whom it is set up.    It is never allowed when repugnant to good conscience, when it is the offspring of artifice, when the party setting it up has been guilty of bad faith, actual or constructive, and never when, if sanctioned and admitted, it would prejudicially affect the previously acquired rights of innocent third parties.    Pardessus Dr. Com. Vol. 1, No. 235; Merlin Vo. Compens. 2, No. 11; Toullier 4, p. 381; Mourlon 2, p. 761, No. 1452 (C. N. 1290); 5 R. 288; 6 A. 46, 207; 7 A. 53; 10 A. 406; R. C. C. 2215.

If it be true that no law can be pointed out which expressly defeats the pretensions of plaintiff, it is equally so that none can be shown which formally forbids compensation from being set up when the claim

has been purchased or acquired since a surrender or cession of property, or since the opening of an insolvent succession. Yet it is a constant principle not to be controverted that counter claims thus acquired cannot be allowed in such cases.

The principle upon which compensation is not permitted in such instances is, that "compensation cannot take place to the prejudice of the rights acquired by third persons," (R. C. C. 2215) and that by the surrender or cession or opening of the insolvent succession, the rights of all the creditors of the bankrupt or insolvent deceased debtor are fixed at the time of failure or death and therefore antedate the acquisition of such claims.

The principle is the same in cases of corporations, like the present one, which become insolvent and go into liquidation, where their failure becomes notorious and knowledge of it is brought home to the creditor who has subsequently purchased the claims and attempts to set them up in compensation.

Toullier, Vol. 4, p. 381, pointedly remarks:

"La compensation n'est pas admise en faveur de celui qui étant créancier ou débiteur du failli *avant* l'ouverture de la faillite est devenu depuis son débiteur ou son créancier de quelque manière que ce soit, car cette compensation porterait préjudice aux droits acquis par les autres créanciers, ce que ne permettent ni l'équité ni la loi." Also authorities hereafter mentioned.

"The equity of the rule on this subject," said this Court in 10 A. 407, "requires that the rights and obligations of all those who have had dealings with the bankrupt should be so far unaffected by the bankruptcy, that no claims should be enforced either for or against the creditors of the bankrupt which might not equally have been enforced for or against the bankrupt himself."

Much stress is laid upon what Mr. Justice Story, in his Eq. Jur. secs. 1438-44, inclusive, and what Mr. Justice Miller, in Blount vs. Windley, p. 178, 95 U. S., have said on the subject of compensation as allowed and regulated by the Roman law and the Civil Code of Louisiana, but conceding the correctness of the views expressed on the matter, it is impossible to discern what application the same may have to the present case, where the claim set up in compensation was acquired *after* the notorious insolvency of the bank. See Waterman on Set-off, p. 23; § 22; p. 149, § 120; p. 193, § 171; p. 222, § 200.

The failure, *i. e.* a suspension on account of insolvency, has the same meaning and produces the same effect, in such cases, as a surrender, or

cession, or opening of an insolvent succession.   The rights of third par-
ties, of creditors of such corporations, whose property is a common
pledge, are fixed at the date of failure, and compensation cannot take
place so as to give a preference to one creditor over another, by paying
him in full to the injury of the others, who would not thus be paid.

It is an error to suppose that the French law, from which ours
derives on this subject, quite directly, almost unaltered, differs in this
particular.

There, as here, compensation is not permitted to be set up, where
the claim is acquired after the failure of the debtor.

A merchant who ceases or suspends his payments, is in a state of
failure.   C. N. 457.

Here, where one is unable to pay all his debts, he is, in a legal aspect,
in failing or insolvent circumstances.   R. C. C. 3556, Nos. 11 and 16.

If there exist any variance or disparity between the two systems, it
consists in this, that our law is broader and more equitable in prevent-
ing compensation in all the cases in which the debts set up against an
insolvent were purchased with knowledge of his insolvency and with
the view of obtaining an undue preference.   3 Larombiere, p. 716, ·
Nos. 7 and 8;  2 Zacharice, p. 413, No. 32;  4 Toullier, 381;  7 Toullier,
No. 380;  Rep. Journal P., Compl. Vo. Faillite, p. 7, No. 4, 5;  p. 49, No.
194;  Cassation, 9 Juillet, 1860.   See also 1 N. S. 484, and 6 N. S, 66;  2
L. 84, and 5 R. 288;  2 L. 85;  2 A. 459;  23 A. 112;  in which the princi-
ple was applied.

The principle under the Code of 1825 and the revised one of 1870, is
the same as that prevailing under the Code of 1808, when the two first
significant cases were determined.

It is undeniable that, if the transaction proposed by plaintiff and
refused by the Institution had taken place, it would clearly have been
such as could have been revoked, for it is glaring that the insolvency
of the concern was manifestly known to all, and specially to the plain-
tiff at the time, and the transaction would have amounted to a payment
in *full* of plaintiff's claims, in derogation and to the prejudice of the
rights of other creditors similarly situated to participate equally in the
common pledge.

How then can it be legally and fairly claimed that the law which
would have the virtue of repudiating and bursting asunder such repro-
bated transaction, can be successfully invoked to force its accomplish-
ment and execution by the sacred fiat of judicial agency?

A system of laws which, could they be desecrated and prostituted to operate so offensively and odiously, and to bring forth such monstrous wrongful and crying enormity, should at once be stigmatized, in unmeasured terms, as the handmaid of fraud and the breeder of iniquity.

The District Judge thus viewed and felt. The judgment appealed from should not be disturbed.

Judgment affirmed, with costs.

Mr. Justice Fenner concurs in the decree.

Mr. Justice Manning takes no part.