Una v. Dodd.

WILLIAM UNA et al., petitioners,

v.

DANIEL DODD et al., respondents.

|     |     |
| --- | --- |
| 39  | 173 |
| 52  | 23  |
| 39  | 173 |
| 64  | 52  |

The officers and managers of a savings bank petitioned the chancellor for an order directing them, among other things, to invest all moneys deposited in the bank, after a designated date, in certain specified securities. Loans of part of these deposits were afterwards made by the president, without the knowledge or subsequent approval of the other managers or finance committee, on the promissory note of the borrowers, secured by collaterals other than those specified in the order. Other loans of part of these deposits were similarly made by the president, under an agreement with the borrowers, that the latter should retain a sufficient amount of "good securities" to cover these loans. The "good securities" never were, in fact, those stated in the order, and the borrowers for several years, and as long as the loan continued, had the custody of the box containing the "good securities" in their own vault, and the exclusive access thereto, and removed and changed the securities at pleasure.— Held, that this court had jurisdiction over the managers, and power to make the order; that the loans by the president were "investments," and a violation of the order, rendering him punishable for a contempt, even if the bank sustained no pecuniary loss therefrom; that the conduct of the other managers was not a contempt, although some of them knew, after the loans had been

made, of the kind of securities taken by the president, and had thus been negligent in the discharge of their duties.

---

On petition and answers and proofs taken in open court.

*Mr. Frederick W. Stevens* and *Mr. Samuel Kalisch,* for petitioners.

*Mr. E. S. Black,* for German depositors.

*Mr. John R. Emery, Mr. Thomas N. McCarter* and *Mr. Benjamin Williamson,* for Daniel Dodd.

*Mr. George W. Hubbell,* for A. Bishop Baldwin, Algernon S. Hubbell, Francis Mackin, Henry H. Miller and George W. Watson.

*Mr. E. M. Colie,* for James G. Barnet and Matthias M. Dodd.

*Mr. Carl Lentz,* for Hugo Fraentzel.

*Mr. Frederick Frelinghuysen,* for William T. Mercer.

*Mr. John W. Taylor* and *Mr. Albert P. Condit,* for William Rankin, Daniel Price and Charles S. Haines.

*Mr. Henry Young,* for Bernard Stanley.

*Mr. Frederick H. Teese,* for Henry G. Darcy.

VAN FLEET, V. C.

The question to be decided in this case is whether certain persons now before the court on a charge of contempt, should be adjudged guilty or not. They are charged with having contumaciously violated an order of this court. It is important that the circumstances under which this order was made should be stated.

The managers of the Newark Savings Institution, on the 12th of December, 1877, represented to the chancellor, by petition,

that while the corporation under their charge was the owner of sufficient assets estimated at their face value to pay all of its depositors in full, yet that a part of its assets were so greatly depreciated in consequence of the depression of the times, as not to be immediately available, except at great loss; they further represented that a very large amount of deposits had been withdrawn during the previous year, and that they believed a much larger amount would be withdrawn during the next year; that they would be able, for a long time to come, to continue to pay depositors on demand, but that that course would make it necessary for them to convert their most valuable assets into cash, leaving those that were depreciated and unavailable, except at a great loss, for the less vigilant depositors; and that they believed that they could not pursue that course without violating their duty as trustees, as it would necessarily result in inequality in the distribution of the assets of the corporation, and those of the depositors would suffer most who were least able to bear loss, and least able to take care of themselves. They further stated that they regarded the institution as an incorporated agency, without capital, and without stock, and that its managers were the trustees of the depositors, to invest the money they deposited with the institution; that the assets of the institution were the property of the depositors, in proportion to their several deposits; that if losses were sustained, the depositors were bound to bear them ratably, and if gains were made, they were entitled to share them *pro rata*. They also stated that they were assured that, by careful management of their trust, under the direction of this court, the existence and usefulness of the institution could be maintained, and its depositors secured against loss, notwithstanding the extraordinary circumstances of disaster in which it had become involved. And they then said that with these views of their duties as trustees, and the rights of their beneficiaries, and in consideration of the magnitude of the interests involved, they were unwilling to proceed further in the execution of their trust, without the direction of this court, which, as they were advised, it was the duty of this court to give in the exercise of its jurisdiction over the administration of trusts.

Una v. Dodd.

They further said that without such direction they were satisfied that they could not maintain the institution in public confidence, nor secure equality in the distribution of its assets among the depositors, which latter, as they declared, was the fundamental principle of the institution. The petition also stated that the managers, before making their application, had sought the best advice as to the nature of their duties, and the extent of their powers that they could obtain, and had, themselves, carefully considered the course best adapted to promote the purposes of their trust, and that their application was the joint result of the advice they had received, and of their own consideration.

On the facts and legal propositions thus stated, the managers asked that such direction be given as would secure a just and equal distribution of the assets of the institution among the depositors; that the court assume control of the future administration of the trust so long as it should be deemed necessary to promote the interests of the institution, and insure its permanency and prosperity, and that an order be made permitting the institution to receive deposits in the future, but providing that such deposits should be treated as special deposits, and be invested only in the bonds of this state, or of the city of Newark, or of the United States, and directing, also, that separate accounts should be kept of such deposits. The intervention of the court was asked to secure two objects : First, a just distribution of the assets of the institution, and second, the preservation of the institution. The managers were represented before the court by counsel of great ability and high distinction, and the court after hearing counsel, and after thorough examination, and full, careful and deliberate consideration, concluded that the managers were entitled to the aid they sought, and an order was accordingly made. *Matter of the Newark Savings Institution, 1 Stew. Eq. 552.* The full text of that part of the order which is material to the present inquiry reads as follows :

"It is ordered by the chancellor that all deposits in said institution made on and after the twelfth day of December, eighteen hundred and seventy-seven, and until the further order of this court, shall be treated as special deposits, and invested only in the bonds of this state, of the city of Newark, or

Una v. Dodd.

the United States, and that separate accounts thereof shall be kept, and the actual interest received thereon, deducting necessary expenses and taxes, be paid as dividends upon such special deposits."

This order was so far changed, on the 2d of June, 1880, as to permit fifty per cent. of the special deposits to be invested in mortgages on real estate, but it also declared that the remaining fifty per cent. should continue to be subject to the regulations theretofore made, and be invested only in United States, New Jersey and Newark city bonds. A very large amount of money was deposited in the institution after the 12th of December, 1877. On the 16th day of May, 1884, when a receiver was appointed to wind up the institution as an insolvent savings bank, there was due to depositors on the new or special deposit account over $6,150,000. The institution was carried down by the failure of Fisk & Hatch, a firm of bankers doing business in the city of New York. When Fisk & Hatch failed, on the 15th of May, 1884, they held, or should have held, United States bonds, belonging to the institution, worth at par $2,036,000, and they owed the institution, in addition, for borrowed money, and for which the institution held no security whatever, $845,000, making a total of $2,881,000, nearly one-half of the whole assets of the new account at the time of the failure of the institution. Another loan, made by the managers to E. H. Harriman & Co., also bankers doing business in the city of New York, of $800,000, was outstanding. This last loan was secured by collaterals, but the collaterals consisted of other securities than those required by the order.

The contumacious acts charged against the managers consist in making investments contrary to the direction of the order of December 12th, 1877, and in violation of both its letter and spirit. Many acts are charged; four are all, however, that need be specified now.

It is charged that the managers made a loan of $800,000, in April, 1883, to E. H. Harriman & Co., and another to the same borrowers, of the same amount, in April, 1884. Both these loans were secured by collaterals, but the collaterals were not such as were required by the order. In both cases the collaterals

consisted mainly of bonds issued by the Illinois Central Railroad Company. It is also charged that the managers, in December, 1882, loaned to Fisk & Hatch, United States four per cent. registered bonds, of the par value of $580,000, without any security whatever; and that in January, 1883, they made a loan of $1,700,000 to the same borrowers, without security.

The managers meet these charges by a denial, first, of the power of the court to make the order alleged to have been contemned; and second, of the fact of contempt. They take the broad ground under their first denial, that the court had no power to make the order, and consequently that they were not bound to obey it, and committed no contempt in violating it.

If it were possible for a party to commit a contempt of court, by the inherent insolence of his defence, it would seem to be quite plain, when the circumstances under which the order alleged to have been violated was made are considered, that some of the persons now before the court on a charge of contempt, must be adjudged guilty, whether their conduct prior to their appearance in court, on the present charge, justified their conviction or not. With my views of what constitutes propriety, decency and manliness, it is scarcely possible for me to imagine a course of conduct more disrespectful and insulting than for a suitor to ask a judicial tribunal to give him, by the rightful exercise of its undoubted jurisdiction, aid and protection, convince the court that he is entitled, by the law of the land, to what he asks, cause the judgment of the court to be entered on its records and take to himself all the benefit and advantage that can accrue from the judgment, and then, after he has got all he can get, and when his interests, or his caprice, or his conceits make it desirable for him to do so, to insult the court by trampling upon its judgment and defying its authority, and when he is called upon to answer for his misconduct, to tell the court that it is without power to punish him, for it had no authority to pronounce the judgment which he convinced it that it had authority to pronounce, and which he has since contemned. This is not, however, the attitude in which that manager, in whose behalf this defence has been most strenuously urged, stands be-

Una *v.* Dodd.

fore the court. He was unwilling that this defence should be made ; it was made, as his counsel state, against his protest. I am satisfied that if his position before the court is that of a mocker, he has not assumed it voluntarily. His counsel have, nevertheless, interposed this defence for him, and have therefore imposed upon the court the duty of deciding whether it is entitled to prevail or not.

Jurisdiction is power, and when applied to a judicial tribunal means authority to hear and decide judicially. The test in every case of controverted jurisdiction is, Had the court authority to pronounce judgment on the question presented for decision? If it had, its jurisdiction is complete and indisputable, and its judgment, whether correct or erroneous in point of law, is unimpeachable and irreversible, except by direct appellate proceedings. If it had not, its judgment is a nullity, not merely voidable but void. The question in all such cases is not has the court erroneously exercised a power rightfully belonging to it, but has it usurped power and attempted to exercise authority never granted to it.

If the court has jurisdiction over the subject-matter and over the persons to be affected by the judgment, and pronounces a judgment on the question presented for decision by the pleadings, its judgment, whether right or wrong, is, in its very nature and essence, final and conclusive so long as it stands, not only on the parties, but on all the world. A void judgment, however, one which is pronounced without authority of law, and is a simple act of usurpation, is no judgment at all, and concludes nothing and binds nobody.

The defence, then, under this head, to be effectual, must go to the extent of demonstrating that the order alleged to have been contemned was an act of usurpation. If it falls short of that it constitutes no defence. For if the court had jurisdiction, but misconceived or misunderstood the law, or applied it erroneously, and in consequence pronounced a judgment wrong in point of law, its judgment, nevertheless, until reversed, possesses full force, and is just as binding and conclusive as it would be if it were right in point of law. It is not true that disobedience of an order is only a contempt of court when the order violated is free

Una *v.* Dodd.

from legal error, and is in that sense a lawful order. The estab-
lished doctrine on this subject is this: A judgment or an order
made by a court having jurisdiction must be obeyed, even if
error is manifest on its face. Error in such case can only be cor-
rected by appropriate legal proceedings and not by disobedience.
A party accused of contempt cannot excuse or exculpate himself
by alleging, or even showing, that the judgment or order which
he has violated is erroneous in point of law. He must go further
and show that the judgment or order is void. If the court had
power to pronounce the judgment, or to make the order, then,
whether correct or erroneous, it is the established law of the case
until reversed, and on proceedings for contempt its validity in
point of law can neither be examined nor disputed. *Richards* v.
*West, 2 Gr. Ch. 456; Cape May and Schellengers' Landing R. R.
Co.* v. *Johnson, 8 Stew. Eq. 422; Woodward* v. *Earl Lincoln, 3
Swanst. 626; Sullivan* v. *Judah, 4 Paige 444; Day* v. *Bergen, 53
N. Y. 404; People* v. *Sturtevant, 9 N. Y. 263; Ex parte Watkins,
3 Pet. 193; Ex parte Kearney, 7 Wheat. 38; Ex parte Reed,
100 U. S. 13; Williamson's Case, 26 Pa. St. 9.* Lord Truro's
statement of this doctrine, in *Russell* v. *East Anglian Railway
Co., 3 Macn. & G. 104, 117,* is so apposite and forcible that I
cannot refrain from quoting it. He said: "It is an established
rule of this court that it is not open to any party to question the
orders of this court by disobedience. I know of no act which
this court may do which may not be questioned in a proper form
and on a proper application; but I am of opinion that it is not
competent for any one * * * to disobey an injunction, or
any other order of the court, on the ground that such orders
were improvidently made. Parties must take a proper course to
question their validity, but while they exist they must be obeyed.
I consider the rule to be of such importance to the interests and
safety of the public, and to the due administration of justice,
that it ought on all occasions to be inflexibly maintained." The
question then is, Is the order alleged to have been violated void
or not? Its nullity is put mainly on the ground that this court,
in the exercise of its original or general jurisdiction, and in the
absence of statutory authority, has no authority to interfere in,

or to assume control over, the internal affairs of a corporation. Stated in its most general and comprehensive form, the legal principle above enumerated is undoubtedly correct.   Mr. Spence, in his treatise on Equitable Jurisdiction, says :  " The court of chancery, before the passage of the municipal corporation act, did not entertain jurisdiction to compel the application of property belonging to a corporation, to corporate purposes, from the difficulty, as it would seem, which would have attended the attempt to carry out such a jurisdiction.   But," he adds,  " where there is any fund created for the purpose of being applied to some public purpose, which fund is vested in a corporation, the court of chancery has, by its original inherent jurisdiction, a right to see to the due application of the fund.   The court of chancery would always lay hold of any breach of trust in relation to the administration of property, let the party guilty of it be either in a public or private capacity ; and a corporation being a trustee is, in this court, the same as an individual."   *2 Spence's Eq. Jur. 34.*   The jurisdiction of this court to declare whether trusts exist or not, to define and construe their terms, and to control and direct their administration and execution, stands among its most ancient and incontestable powers.   The order in question was made in the exercise of this jurisdiction, and was one that the court was not only undeniably competent to make, but, if the facts which were presented to induce it to act were true, it was one that it was required to make to prevent wrong to the poor and insure justice to the helpless.

Nothing is better settled, nor more familiar as a principle of equity jurisprudence, than that trustees are entitled, in a proper case, to the direction and protection of a court of equity in the discharge of their duties.   Whenever the duty of a trustee is involved in doubt, or the terms of the trust will justify the *cestuis que trust* in settling up conflicting claims to the trust property, there can be no doubt that it is the right of the trustee to do nothing until he receives judicial instruction as to his duty ; and in a case where all the *cestuis que trust* stand on the same foundation, and are all entitled to the same benefit from the trust, and it is possible for a part of them, in consequence of their greater

knowledge or superior diligence to compel the trustee, in the absence of judicial action, to give them an unfair advantage over the others, there can be no doubt that it is the duty of the trustee to take such action as may be necessary to prevent the wrong. If, with full knowledge that wrong was being committed, he failed or refused to act, he would not only be faithless to his duty, but an abettor of the wrong.

The precise nature or character of this trust, whether, according to settled definitions, it should be called a public trust, or a *quasi* charitable use, or a private trust, is, in my view, a matter of no importance whatever to this inquiry. The power of this court to take cognizance of all trusts when judicial action is required, is beyond dispute. It has original and exclusive jurisdiction of all public trusts. Its judgment that a certain trust is a good charitable use, whether correct or erroneous in point of law, must stand as final and conclusive, and as declaring the law authoritatively for that particular case until reversed. That the assets of a savings bank in the condition that this institution was represented to be in when the managers sought the protection and direction of this court, are held in trust for all the depositors, is a proposition so incontestably sound in its law as to stand, in my judgment, entirely outside of the domain of debatable questions.

Such a corporation as this differs in all its essential features from an ordinary joint stock corporation. It has no capital or stock; it is not created for the benefit of its incorporators; its managers, as managers, have no property in its funds, but it is created solely for the benefit of such persons as shall become depositors in it. Its fundamental object is to ameliorate the condition of those who are compelled to depend upon their labor for sustenance and the accumulation of property, by inciting them to the practice of habits of industry and frugality. This is accomplished by affording them an incorporated agency or trustee, for the safe keeping and provident investment of their surplus earnings. The depositors, who alone are beneficially interested in the prosperity of the corporation, have no voice in its management, nor in the selection of the persons to whom its

Una *v.* Dodd.

management is entrusted.    The only assets of such a corporation
are its investments, representing the common contributions of all
its depositors, in which all have a common interest.    All the
profits the corporation makes must be divided among all its de-
positors, or accumulated in a surplus for their joint benefit or
greater security.    As each depositor is entitled to his proportion-
ate share of the profits, so, in equity, each must bear his propor-
tionate share of the losses.    *Hannon* v. *Williams, 7 Stew. Eq. 255 ;
Matter of the Newark Savings Institution, 1 Stew. Eq. 552 ; Stock-
ton* v. *Mechanics and Laborers Savings Bank, 5 Stew. Eq. 163 ;
Coite* v. *Society for Savings, 32 Conn. 173 ; Bunnell* v. *Collins-
ville Savings Society, 38 Conn. 203.*    Mr. Justice Strong, of the
supreme court of the United States, in *Huntington* v. *Savings
Bank, 96 U. S. 388,* said that the primary idea of a savings
bank is, that it is an institution in the hands of disinterested
persons, the profits of which, after deducting the necessary ex-
penses of conducting the business, inure wholly to the benefit of
the depositors in dividends, or in a reserved surplus for their
greater security.    He also likened such a corporation to that of
church wardens, for the conservation of the goods of a parish, to
a college of surgeons for the promotion of medical science, and
to a society of antiquaries for the advancement of the study of
antiquities.

If the foregoing summary states, with anything like substan-
tial accuracy, the nature and objects of a savings bank, it seems
to me that there is no ground whatever for doubt that if the
condition of the Newark Savings Institution was what the peti-
tion of the managers represented it to be at the time the order
in question was made, it was not only competent for this court
to make the order, but it was its imperative duty to do so.

But it is also insisted that the order alleged to have been
contemned is void, because the court did not have jurisdiction of
the parties necessary to enable it to make a valid order.    The
court unquestionably had jurisdiction of the managers.    Service
of process on a suitor who comes asking the protection and
direction of a court, is not necessary to give the court jurisdic-
tion over him.    He submits himself to the jurisdiction of the

court, by invoking its judgment. None but persons having an interest in the subject-matter of a suit or proceeding, can be made parties to it. It was not possible in this branch of the proceeding, according to settled rules of procedure, to bring any other person or party before the court than those that were there. The managers asked that this corporation be preserved, and to that end that it be allowed to receive deposits in the future. They also asked that such deposits be kept separate from the other assets of the institution, and be invested only in such securities as were, according to general experience, safe and good, readily convertible at any time, and not liable to depreciation. They were the only persons who then had the slightest interest in the questions thus presented. The questions concerned their future conduct as trustees, with reference to money to be thereafter committed to their care, and they were, therefore, obviously the only persons whom the court could have before it. Besides, the order concerned them alone. They asked to be directed as to what they should do in the future, in the discharge of their duty as trustees. The court told them. They had a right to ask for direction, and it was the duty of the court to give it, and they, after receiving it, were bound not only to respect it, but to follow it implicitly.

The order under consideration was, in my judgment, not only a rightful exercise of lawful power, and not a usurpation, but was also correct in its law, and wise in its provisions and policy. Had it been obeyed, an old and valuable charitable institution would have been preserved to the public, public confidence would have been restored, and all danger of loss to the depositors averted.

This brings us to the question, Has the order been contumaciously violated? In a case of this kind, in order to justify a conviction, the proofs must show clearly and satisfactorily that the party accused has willfully disobeyed the order of the court. If his disobedience is the result of honest mistake, or if the order alleged to have been contemned is so uncertain and ambiguous in its terms as to fairly warrant two constructions, one of which will make his act or omission a contempt, and the

other, not, there being no contempt in fact, none should be adjudged in law. The order in this case is free from all uncertainty, and very clear, plain, direct and positive in its terms. The managers had asked the chancellor to assume control of the future administration of the trust, and to give such direction, and to prescribe such regulations for its future management as he should deem necessary to insure the permanency and prosperity of the institution. They wanted direction which should cover the whole field of their duty. They asked specially that he would permit the institution to receive deposits in the future, and by order direct that such deposits should be kept separate from the other assets of the institution, and be invested only in certain securities. Such an order was made, and the question now before the court is, Has it been willfully violated?

There is no dispute; indeed, the fact is confessed that a loan of $800,000 was made to E. H. Harriman & Co., in April, 1883, on their note at eleven months, secured by other collaterals than those prescribed by the order; and that another loan of the same amount to the same borrowers was made on the same terms, and secured in the same way, in April, 1884. The first of these loans was paid before the second was made, and the last was paid to the receiver after the failure of the institution. These facts would seem to demonstrate beyond all controversy that the order had been willfully violated. But it is said that although a technical contempt may have been committed, yet nobody was harmed by it, no loss ensued, and where that is the fact, to punish the contemner for his contempt, is an act of vengeance. I do not understand that to be the law. The law does not indulge in revenge. When a court inflicts punishment on a contemner of its authority, it does not do so from any sense of personal wrong or insult, but to vindicate the power and majesty of the law, and to compel obedience to its mandates. It is the duty of every citizen to respect and obey the law. There can be no civil order, or safety of person, or security of property without obedience to law, and obedience to the constituted authorities will prevail just to the extent that it is certain that *punishment will follow disobedience.*

Besides, when a court makes an order, it is impossible for the court to follow the person to whom the order is issued, from day to day, to see that it is obeyed. It has a right to repose confidence in the loyalty of the citizen to the law, and to believe that he will obey its mandate. If its confidence is abused, it must punish the offender. That is the only means at its command to maintain its authority and deter disobedience.

But it is also contended that those transactions were temporary loans, and not investments, and were not, therefore, within the terms of the order, nor interdicted by it.

Both terms—" invest " and " temporary loans "—are used in the charter. By the seventh section of the charter (*P. L. of 1847 p. 108*), it is enacted that the corporation shall invest no money in any other than certain designated securities. By a supplement passed in 1859 (*P. L. p. 5*), the corporation is authorized to make temporary loans upon personal securities, with pledges of collateral securities at least equal to the amount loaned. So far as I am aware, there is no technical legal definition of the term "investment" as applied to money. In its most comprehensive sense, I think it is generally understood to signify the laying out of money in such manner that it may produce a revenue, whether the particular method be a loan or the purchase of stocks, securities or other property. In common parlance, it means putting out money on interest, either by way of loan or the purchase of income-producing property. The order under consideration was intended to prescribe, and does prescribe, in very plain terms, that the special deposits received under it should be used for investment in certain designated securities, and for no other purpose whatever. Its direction is, that the new deposits shall be treated as special deposits, and invested only in certain designated securities, that a separate account shall be kept of them, and the interest received on them distributed in dividends among the persons making such deposits. There are some things so plain that argument rather serves to obscure than to make more manifest. One of the objects of the managers in asking the court to assume control of the future administration of the trust was, to insure the permanency and future pros-

perity of the institution.   That could not be attained, unless the most explicit and trustworthy assurances were given to the public that every dollar thereafter deposited would be safely kept, and so invested as to render a recurrence of the circumstances of disaster in which the institution was then involved, impossible.   The managers understood that, and for that reason asked that the direction to be given respecting the manner in which the new deposits should be treated and employed, should be such as should exclude the least possible danger of loss, and assure the public that they would be invested in certain unquestionably safe securities and in no other way.   Such direction was given.   The managers were directed not to invest, that is, to place or put the new deposits in any other securities or property whatever than those designated in the order.

But, in addition, I think it may well be doubted whether a loan which is made for eleven months, and is then paid to answer a temporary purpose of the creditor, and as soon as that purpose is effected, is renewed or made again for the same period, can fairly be called a temporary loan.   Subtle discriminations are generally delusive.   The court, in such an affair as this, as well as in all others, must have regard to the substance of the matter, and allow its judgment to be controlled by the facts of the case rather than by artful and nice distinctions.

My conclusion is, that the loans to E. H. Harriman & Co. were made in violation of the order of the court, and constituted willful contempt of its authority.

The managers are charged with another act of contumacy. They are charged with having made a loan to Fisk & Hatch, in January, 1883, of $1,700,000, contrary to the terms of the order. The terms on which this loan was made are stated in a letter written by Fisk & Hatch to Mr. Daniel Dodd, president of the institution, on the 29th of January, 1883.   Fisk & Hatch, by the letter, say :

"Upon the understanding that the money now in our hands, belonging to your institution, is to remain with us right along, say for a year, except as any part of it may be sooner required to meet extraordinary or unexpected demands from your depositors, we have decided to mark back the rate of interest

to five per cent., as a permanent rate. It is understood, of course, that we are to keep, at all times, in your special box in our vaults. a sufficient amount of good securities to cover the amounts with ample margin."

Fisk & Hatch at this time owed the institution $1,700,000, nearly one-third of the whole of the new assets. This sum was of sufficient magnitude to make even a person accustomed to control and dispose of millions conscious of his responsibility, and to impel him to exercise the utmost caution. The box mentioned in the letter as the special box of the institution, was not the property of the institution, but of Fisk & Hatch; they held the box, and the keys which locked and unlocked it; the box was kept in their vault; there no officer of the institution could enter without their leave; a simple no, without even closing the door of the vault, was all that was necessary, at any time, to put it completely beyond the power of the institution to reduce a single one of the securities held for this large sum of money to its possession, until after the debtors had had full opportunity to place them all beyond the reach of even judicial power. When the bonds which, according to the letter of the contract, were to stand as security for this loan, were set apart and put in the box, if such a thing was ever done, no one attended on behalf of the institution to see it done. The selection of the bonds, their arrangement and placing them in the box, were all intrusted to the borrowers. No one on behalf of the institution even stood by as a witness. The letter of the contract, it will be observed, promises security, to give a sufficient amount of good securities to cover the loan with ample margin. I shall not stop to inquire whether the manager who negotiated the loan notified the borrowers that nothing but United States bonds would be accepted as collaterals, and therefore understood, when the borrowers said that they would give good securities, that they meant good securities of the class or kind which he had told them would alone be accepted. I may, however, say that I think he was fully justified in believing that they meant by " good securities " such as he told them would alone be accepted. The letter of contract, as already stated, promises to give security, but it also provides that the collateral shall remain in the

possession of the debtors, and be subject to their control. On this point Mr. Dodd, who negotiated the loan, swears that Fisk & Hatch agreed to pay interest at the rate of five per cent. on the loan, provided the collaterals were left in their possession to be exchanged for other collaterals when necessity required. They, of course, to decide when the exchange should be made.

Was this an investment of the funds of the institution in accordance with the terms of the order, or a willful violation of the terms of the order? Was it even a loan on security?

The order, in plain terms, interdicted any use of the money received under it, which would be attended with the least hazard. The safe keeping and secure investment of all moneys received under it, were its primary and ultimate objects. These purposes were as conspicuous on the face of the order as was the fact that the order was written in the English language. This contract was still in full force when Fisk & Hatch suspended; they were still indebted to the institution in the sum of $845,000; the special box was still in their vaults, but the box was empty, and the institution was without a penny's security. Fisk & Hatch had availed themselves of the control which their contract gave them over the collateral to deprive the institution of its security; true, not honestly, but fraudulently, but none the less effectually. When the contract of loan puts it in the power of the debtor, to deprive his creditor of the collateral pledged for the payment of his debts, it is an abuse of language to say that the loan is made on security. The only security the creditor has under such a contract is the honor of his debtor. If he is honest, he will not misappropriate the collateral he has pledged for his debt, let the temptation to do so be as strong as it may; if he is not, he will, whenever the temptation is strong enough to make it to his interest to do so; so that the matter stands in this wise: Under such a contract the creditor has security when he does not need it, but when he does, he has none.

Except for short intervals, the proofs show that the loan was wholly unsecured by any collateral whatever. There were no collaterals in the box nor anywhere else. Hatch swears that he is not aware that any securities had been laid out or designated.

as collateral to this loan, but that the securities which were held in the office were considered held for that purpose. That is, that Fisk & Hatch considered that the securities in which they were constantly dealing, by sale, purchase, pledge and exchange, stood as security for this loan, but he also says that neither a part, nor the whole of them, had in any way been appropriated, marked, or set apart so as to show that the institution had any right to, or claim upon them. Nothing, in fact, had been done by either Fisk & Hatch or the institution, to give the institution any claim upon, or right to any property of Fisk & Hatch superior to that of any other of their unsecured creditors. A committee of the board of managers, called the auditing committee, were required by the by-laws of the institution to make a quarterly examination of the cash, securities and accounts of the institution, and to report their condition to the board. During the time this loan was outstanding it was necessary that this committee should go to the office of Fisk & Hatch, not only to examine the collateral pledged for this loan, but also to see that the United States bonds belonging to the institution, which the books of the institution showed were in the possession of Fisk & Hatch, were there. The proofs show that Fisk & Hatch always knew a few days in advance on what day this examination would be made, and in order to have the special box prepared for the inspection of the committee, they would direct their cashier to put in it such bonds as the state of their account with the institution required them to have there. The cashier swears that he usually received instruction, two or three days before the committee were expected, to prepare the box for their inspection, and that in making such preparation he would obtain from outside sources such bonds of the kind that Fisk & Hatch were required to have, as they did not have in the office.

In my judgment, it would be an abuse of language to say that this transaction was not a plain violation of the order under consideration. Such a transaction is, I think, without a precedent in the history of the modern business world. I cannot believe that a single officer of this institution would have loaned $5,000 of his own money on the same sort of security to any borrower

Una *v.* Dodd.

whose personal integrity did not give him all the security he desired. This transaction is without a counterpart even in the history of the business dealings of this institution. Other loans on collateral security have been made, but in no other instance was the debtor allowed to retain possession of the collateral and to control it at his will.

Other contumacious violations of the order are charged against the managers, but as they may hereafter be made the subject of investigation in an action to compel the managers to make restitution of what the institution has lost·in consequence of their misconduct, and as no consideration of primitive justice renders it necessary to deal with them now, I feel justified in deciding the case without expressing an opinion upon them.

The only question that remains for consideration is, Who committed the acts which have been adjudged to be contempts, or so far participated in their commission as to make himself responsible for them? The answer, so far as it concerns Daniel Dodd, is easy and unavoidable. He negotiated all three of the loans. The minutes of the finance committee, and also of the board of managers, fail to show that either loan was ever brought to the attention of either body, or that their concurrence in either was ever solicited or desired. All three transactions were negotiated and consummated without mention of either, before either body, when assembled as a committee or a board. Mr. Dodd swears, it is true, that he conferred with three members of the finance committee respecting the first loan to the Harrimans, made in April, 1883, but all the members of that committee, now living, swear that they never heard of it until after the loan was made. Some say they never heard of it at all, and those that admit knowledge of it say that it had been made long before they heard of it, and when it did come to their knowledge they were told that the collateral was government bonds. The clear and decided weight of the evidence, indeed almost the whole evidence, shows that all three of these loans were, in their inception and completion, the acts of a single individual. There is no proof which, in my judgment, will support a conviction of either of the other managers. It is true it is shown that three of the managers, namely,

Una *v.* Dodd.

A. Bishop Baldwin, Algernon S. Hubbell and Francis Mackin, knew that the order had been violated; in other words, that they knew that part of the money secured under the order had been used in a manner prohibited by the order. They knew that the funds of the institution were being used for prohibited purposes, and in a manner which endangered their safety, and they did nothing to correct the abuse nor avert the danger, but they did not violate the order themselves nor abet nor aid another in doing so. They were unquestionably guilty of negligence, and it may be that their negligence was so gross as to render them legally liable for its pecuniary consequences. *Williams* v. *Halliard, 11 Stew. Eq. 373.* But mere negligence cannot, under such circumstances, be held to constitute contumacy.

Daniel Dodd must be adjudged guilty of contempt, but the order to show cause must be discharged, but without costs, as to the other managers.

It is not improper to state that the examination and consideration of this case have occupied much time and required great labor. The power which the court is called upon to exercise has been described as arbitrary, despotic and omnipotent. It is certainly a very strong power. The judgment of a court having authority to punish contempts, adjudging a citizen guilty of contempt, is final and unappealable. If the power is abused, or harshly or intemperately exercised, the victim is without redress. He may procure the judge to be impeached, but that will give him retribution, not redress. The power, however, is indispensable to the orderly and effectual administration of justice. Without it there are many instances in which a court would be powerless either to preserve order or to enforce obedience to its process, and it would always be within the power of a few lawless ruffians to interrupt and obstruct the proceedings of the highest court in the land, and transform scenes which should be characterized by the greatest order and solemnity into scenes of riotous tumult and disorder. The power is unquestionably necessary, but should be exercised only when absolutely necessary, always sparingly, and never without the utmost caution and deliberation. This case involved no consideration which made a

hasty decision either proper or desirable. It involved no claim for remedial justice. Whether the managers were convicted or acquitted would neither add to nor take from the fund to be distributed to depositors one penny. It involved no question of criminal law. This court has no power to inquire, either for itself or for any other tribunal, whether or not a crime has been committed, and any attempt by it to enter upon such inquiry would justly subject it to the reproach of officiously intermeddling in a matter entirely beyond its jurisdiction. The only question addressed to it in this proceeding is, Has its order been violated in such manner and under such circumstances as to make it its duty, for the purpose of maintaining its dignity and power, to punish the offender? The object of the proceeding is to do primitive justice. It has no other purpose. A judge who either hastens or falters in the discharge of any duty, under the stress of extraneous influence, come from what source it may, has neither the courage nor the independence necessary for the faithful discharge of his duties.